UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KATHLEEN O'HARA,

                        Plaintiff,                        **COMPLAINT**

                 -against-                        Jury Trial Demanded

BOARD OF COOPERATIVE EDUCATIONAL SERVICES,
SOUTHERN WESTCHESTER; HAROLD COLES, JAMES       Case No.:
GRATTO, DAVID PULLEY, LISA SCHUCHMAN, JOHN
KNIGHT, in their official and individual capacities.

                     Defendants.
------------------------------------------------------------------------X

       Plaintiff, KATHLEEN O'HARA, by and through her attorneys, Leeds Brown Law, P.C.,

as and for her complaint against the Defendants herein, alleges, upon personal knowledge and

upon information and belief as to all other matters:

## JURISDICTION AND VENUE

       1.     This action is brought against Defendant, Board of Cooperative Educational

Services, Southern Westchester, for its violations of the Fourteenth Amendment to the

United States Constitution (as enforced by 42 U.S.C. § 1983); Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., Americans with Disabilities

Act, 42 U.S.C. 12111, et seq., the New York State Executive Law §290 et seq., New

York State Executive Law, Human Rights Law, § 296, et seq., and any other cause of

action which can be inferred from the facts set forth herein.

       2.     This action is brought against individual Defendants Dr. Harold Coles (District

Superintendent), James Gratto (Assistant Superintendent), David Pulley (Assistant

Superintendent), Lisa Schuchman (Director of Special Education), John Knight (Title IX

Officer) (hereinafter "individual Defendants"), in their official and individual capacities,

for their violations of the Fourteenth Amendment to the United States Constitution (as enforced by 42 U.S.C. § 1983); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., Americans with Disabilities Act, 42 U.S.C. 12111, et seq., the New York State Executive Law §290 et seq., New York State Executive Law, Human Rights Law § 296(6). and any other cause of action which can be inferred from the facts set forth herein.

3.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331. The supplemental jurisdiction of this Court is invoked over state causes of action, pursuant to 28 U.S.C. § 1367.

4.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the action, including the unlawful employment practices alleged herein, occurred in this district.

5.     Following a "probable cause" determination by the New York State Division of Human Rights, Plaintiff received her Dismissal and Notice of Rights from the Equal Employment Opportunity Commission, dated June 20, 2018.

6.     Any and all other prerequisites to the institution of this action have been met.

## PARTIES

7.     Plaintiff, Kathleen O'Hara ("Plaintiff" or "Kathleen"), during all relevant times, was and remains a resident of Westchester County, State of New York.

8.     Defendant, Board of Cooperative Educational Services, Southern Westchester ("BOCES"), at all times hereinafter mentioned, was and still is a public-school district organized under the laws of the State of New York with its principal place of business at 17 Berkley Drive, Rye Brook, New York 10573. Defendant is the entity that is in control

of the school referenced in the body of this Complaint.  The District is an "Employer" as defined by all relevant statutes.

9.      The District maintains its principal place of business at 17 Berkley Drive, Rye Brook, New York 10573.

10.     The individual Defendants are policymakers for the District, and are named in their official and individual capacities. The principal place of business for the individual Defendants is 17 Berkley Drive, Rye Brook, New York 10573.

## FACTS

11.     In October 1988, Kathleen O'Hara ("Kathleen") began working for BOCES as a full-time Teacher of the Speech and Hearing Handicapped ("TSHH").

12.     During her employment, and while serving BOCES as a TSHH, Kathleen continued her education and professional development, earning a Masters of Arts in Speech and Language Pathology, as well as obtaining a clinical license as a Speech and Language Pathologist for New York State, as well as a Certificate of Clinical Competence ("CCC") from the American Speech and Hearing Association ("ASHA"). Kathleen continued to take courses and also earned a Certificate in Assistive Technology.

13.     Over the next 28 years, Kathleen built a career of excellent service providing speech and language therapy to lower functioning children with a specialty area of designing and adapting augmentative communication systems for nonverbal students.

14.     Kathleen continued to receive favorable performance evaluations for her work.

15.     In or around the 2010/11 School Year, Kathleen began experiencing increasing pressure from supervisors to use her clinical license to "sign off" on services provided to

students, so that Southern Westchester BOCES could enable their component School Districts to bill Medicaid for therapy.

16.    Though she was hired as a teacher, and was serving as a TSHH, Kathleen experienced extreme pressure to "sign off" with her clinical license. The action of "signing off" confirms from a clinical standpoint that services were provided in a manner which adheres to the rules and regulations set forth by Medicaid, enabling Southern Westchester BOCES' component School Districts to be able to bill for Medicaid reimbursement.

17.    In investigating the matter, Kathleen discovered that her colleague, Marlane Amelio ("Amelio"), had been "signing off" on Service Recommendations by stating that Kathleen was acting "under the direction of" Amelio. Kathleen complained to then-Director Mary Ellen Betzler and other staff, including a compliance specialist, Ana Reluzco, about the Service Recommendations, which Kathleen asserted were false. However, no action was taken.  In at least one instance, Kathleen discovered that her name had been signed on the document, while others contained printed use of Kathleen's name, with clinical credentials added.

18.    Instead, Kathleen was told that she was to use her clinical license to "sign off" on therapy sessions, even though they did not meet the standard for Medicaid billing, or that Amelio would "come to [her] sessions." This was a continuous threat for the remainder of Kathleen's career at BOCES.

19.    Thereafter, and continuing through the conclusion of the 2015/16 School Year, Kathleen was subjected to a disparately heavy caseload and associated workload, in comparison to her colleagues.

20.     While serving as a TSHH, and continuing through the 2015/16 School Year, Kathleen voiced opposition to the use of her clinical license to "sign off" on Medicaid billing, where services did not meet the clinical standard.  In sum, while billing was being submitted for a clinical level, services were not being provided which adhered to the necessary clinical standard.

21.     As a result of her complaints concerning the failure to meet the clinical standard, Kathleen began receiving impossible workloads, involuntary transfers, assignments outside of her scope of practice, and inadequate travel time to arrive to locations within BOCES' territory to provide services to students.

22.     In or around the 2012/13 School Year, and despite being involuntary transferred on numerous occasions; Kathleen sought and was denied a transfer. Kathleen requested the transfer due to repeated acts of physical violence that Kathleen experienced at BOCES' Rye Lake campus.

23.     At the time of her transfer requests, there were open cases, which Kathleen had previous experience with, and would have allowed Kathleen's seamless transfer.

24.     Instead, BOCES denied Kathleen's transfer request, and let the cases remain unassigned.

25.     As a result of the failure to transfer, Kathleen suffered 2 fractures, 2 concussions, and repeated incidents of being bitten, struck, and choked by students, while working at the Rye Lake campus.

26.     Kathleen filled out Line of Duty Injury ("LODI") forms relating to each incident of injury, formally placing BOCES on notice of each incident.

27.     Following these injuries, and her complaints to Supervisor Will Guterman ("Guterman") Kathleen was subjected to increased workplace bullying and hostility.

28.     Kathleen's TSHH colleagues, who had not sustained workplace injuries, or voiced opposition to dangerous workplace placement, were not subjected to a hostile work environment.

29.     Kathleen voiced repeated opposition to her excessive workload, but no relief was provided.

30.     During the 2011/12 School Year, Kathleen's Assistant Director, Michael Schulman, acknowledged that her caseload was too heavy. However, Supervisor Guterman assigned Kathleen an even heavier caseload for the 2012/13 School Year. Upon information and belief, this was an attempt to further subject Kathleen to a hostile work environment, and to retaliate against her for her prior complaints.

31.     In January 2013, Kathleen reported Guterman's workplace bullying to Assistant Superintendent Sheila McGuinness, as well as to District Superintendent Dr. Harold Coles ("Coles"), who was also then-serving as the District's Title IX representative. However, no relief was provided.

32.     In or around June 2013, and because of lack of response from her January 2013 complaint, Kathleen requested to meet with and met with Superintendent Coles concerning her allegations of workplace bullying by Guterman. Dr. Coles did not appear to investigate the situation and did not request any further information from Kathleen.

33.     Following her complaints to Superintendent Coles, Kathleen faced even greater increases to her caseload, and a significant increase in a practice of adding and transferring students in her care.

34.     Around the beginning of the 2014/15 School Year, BOCES hired Lisa Schuchman ("Schuchman") as an Assistant Director overseeing Kathleen.

35.     Notably, prior to coming to Southern Westchester BOCES, Schuchman had previously been suspended from 2 prior positions due to issues concerning allegations of workplace bullying.

36.      In Fall 2014, Kathleen suffered another concussion from a student attack.  As a result, she was required to take protected medical leave.

37.     Kathleen filled out her LODI materials, notifying her employer of the attack.

38.     Thereafter, Kathleen was diagnosed with Post-Concussion Syndrome. BOCES was provided with medical paperwork confirming this diagnosis.

39.     On December 1, 2014, Kathleen complained via email to Assistant Director Schuchman, advising her supervisor that her new schedule was in violation of her contract, as well as providing inadequate time to drive to provide therapy to students.

40.     Specifically, Kathleen complained that having 9 sessions per day violated a 250-minute maximum on services provided per day, in violation of her contract.  Upon information and belief, these increases in scheduling were further intended to harass Kathleen, and target her for taking protected medical leave.

41.     On or around December 22, 2014, Kathleen was directed to meet with Assistant Superintendent David Pulley ("Pulley"), who was serving as the BOCES Medicaid Compliance Officer. During the meeting, Pulley used threatening terminology to make false allegations to intimidate Kathleen.  At the end of the meeting, Pulley told Kathleen that if any session that Kathleen performed lasted less than 30 minutes, he would

recommend that charges be filed against Kathleen, which could subject her to penalties up to and including termination.

42.     Notably, Kathleen was required to provide diligent records concerning her service times, as per her licensure.

43.     Kathleen was assigned to provide for back-to-back sessions for students who were on different floors and at times in different buildings, rendering service time less than 30 minutes, as time was required for transportation of students, who were incapable of traveling to their locations without adult assistance. Kathleen was also instructed by Assistant Superintendent Pulley and Supervisor Guterman to include the travel time in the billing.

44.     Upon information and belief, these schedules and time requirements were intended to set Kathleen up to fail, and to further harass and intimidate her.

45.     Kathleen complained about these scheduling issues, but no action was taken to address her complaints.

46.     On January 19, 2015, Kathleen complained to Superintendent Coles concerning Assistant Superintendent Pulley's intimidation, specifically advising that she was being subjected to workplace bullying, as well as threats concerning her employment.

47.     On or around February 12, 2015, and following her complaints, Kathleen discovered that falsified notes, which included disparaging comments about Kathleen and her work as a therapist, had been entered into her students' electronic files. Upon information and belief, these falsified statements, made by Amelio, were further intended to harass and intimidate Kathleen.

48.     Kathleen complained about these falsified revisions to Assistant Superintendent/Medicaid Compliance Officer Pulley. Pulley failed to take action to address the falsified Medicaid notes. Upon information and belief, these notes were designed to discredit Kathleen's work, placed Kathleen's licenses in jeopardy, and further intended to harass Kathleen.

49.     On or around March 11, 2015, and almost immediately after she complained, Kathleen was advised that the District wanted to assign additional students to her caseload. Kathleen had been complaining throughout the 2014/15 School Year about being overloaded, but no action had been taken to alleviate her complaints. Now, she was being told that BOCES wished to increase her caseload again.

50.     Beginning in September 2015, and continuing throughout the 2015/16 School Year, Kathleen experienced a change in the manner in which she was observed. Direct supervisors traditionally complete observations; however, Assistant Director Schuchman told Kathleen she was assigning Amelio to observe Kathleen's sessions. Amelio, who had been the subject of Kathleen's prior complaints, now had the ability to have continued access to Kathleen's students' files and "sign off" under Kathleen's name. Upon information and belief, this was further intended to create a hostile work environment for Kathleen and jeopardize her professional licenses.

51.     At the start of the 2015/16 School Year, Kathleen was again subjected to an involuntary transfer to Rye Lake Campus. Notably, this was the location of Kathleen's prior injuries, and her prior requests to transfer. Upon information and belief, this involuntary transfer was unnecessary, and intended to further harass Kathleen. The Rye

Lake Campus is also the location of Schuchman's office, which made daily encounters more common.

52.     As a result of the continued harassment and workplace retaliation she was experiencing, Kathleen began suffering from medical issues including ulcers, which required medical care, as well as Kathleen's use of protected medical leave. Kathleen was advised that her condition was impacted by workplace-related stress.

53.     Additionally, throughout the 2015/16 School Year, Kathleen was repeatedly contacted by Assistant Director Schuchman and her secretary, who made repeated demands for Kathleen's schedule. These demands often came while Kathleen was taking medical leave, relating to her workplace stress and anxiety.

54.     In or around January 2016, Schuchman became Director of the Special Education Division, increasing her authority over Kathleen.

55.     On January 12, 2016, Kathleen emailed newly-hired Supervisor Jessica Walker ("Walker") concerning the disparately large size of her schedule.

56.     Supervisor Walker, who is an ASHA Certified Speech and Language Pathologist, possessed the ability to oversee Kathleen's services, rendering Amelio's participation in Kathleen's services unnecessary.

57.     Immediately thereafter, Schuchman assigned another student to Kathleen. Upon information and belief, this assignment was made to further antagonize Kathleen, and to retaliate against her for her taking of protected leave.

58.     On February 9, 2016, Kathleen took a sick day. While out sick, Kathleen was contacted on her emergency number, as provided to Southern Westchester BOCES. Upon

information and belief, this unnecessary communication was intended to further harass Kathleen while she was taking protected leave.

59.    On February 11, 2016, Supervisor Walker came to Kathleen's office and announced that Amelio would be joining her to observe, in contrast to District practices concerning observations not being performed after sick days. Kathleen contacted Superintendent Coles, specifically complaining about the continued hostile work environment.

60.    On March 1, 2016, Kathleen was called into a meeting with Walker and Schuchman. Kathleen reiterated her complaints that co-worker Amelio had been entering student electronic files, back dating notes, making false and disparaging comments and signing off on as a UDO, indicating that work was performed "under the direction of" Amelio. Kathleen reported that Amelio had already signed off on a student for the current year, despite having never conducted any observation of the student, and without having any direct knowledge concerning the students' needs.

61.    Director Schuchman ignored Kathleen's complaints. In fact, later that day, on March 1, 2016, Schuchman assigned Walker and Amelio to conduct an observation of Kathleen's student sessions.

62.    On March 4, 2016, Kathleen was issued a counseling memorandum concerning allegations of insubordination.  Notably, it was inaccurately alleged that Kathleen was uncooperative at the March 1, 2016 meeting. Upon information and belief, this Counseling Memorandum was intended to further target and retaliate against Kathleen.

63.    On March 4, 2016, Kathleen followed up on her complaints of workplace bullying. She was advised that Assistant Superintendent James Gratto ("Gratto") was

handling these allegations. On March 18, 2016, Kathleen submitted a response to the allegations in the Counseling Memorandum.

64.     On March 28, 2016, Kathleen submitted a complaint under the Dignity for All Students Act ("DASA"), as applied to BOCES by the Dignity for All: Employee Reporting form, further memorializing her complaints concerning workplace bullying.

65.     DASA complaints are required to be investigated with immediately. However, Kathleen's complaints were not investigated in timely fashion.

66.     On April 11, 2016, Kathleen was scheduled for an endoscopy, with prior notice for her need for medical leave provided to Kathleen's administration.  Despite her prior notice, Kathleen was written up for being out sick while undergoing a serious medical procedure.

67.     On April 12, 2016, Kathleen emailed Assistant Superintendent Gratto to report that the stress of the situation was making her sick and that she was going home. She also asked that he follow-up on her complaint that she was being bullied. Shortly thereafter, Kathleen was contacted by Title IX/EEOC Compliance Officer John Knight ("Knight"), who confirmed that Human Resources Director/Assistant Superintendent Gratto had sent Knight the information concerning Kathleen's complaints. Kathleen believed that BOCES was engaging in behavior to delay the investigation of her complaints, and that her employer was not taking any action in response to her allegations.

68.     On April 14, 2016, Kathleen was assigned a new high school student who was outside Kathleen's Scope of Practice. Upon information and belief, this assignment was in retaliation for Kathleen's taking of protected leave.

69.     On April 15, 2016, Kathleen was issued a second Counseling Memorandum from Schuchman, alleging that she had engaged in insubordination, and further suggesting that Kathleen was not sick.  Upon information and belief, this was further intended to harass and retaliate against Kathleen for taking protected medical leave.

70.     Kathleen was given a copy of the Counseling Memorandum concerning her April 11, 2016 medical leave.  Subsequently, Kathleen received an email from Director Schuchman that Schuchman and Amelio would be physically coming to monitor Kathleen every day that week.

71.     After receiving these messages, Kathleen reached out to Gratto and Knight, inquiring about the status of her complaints of workplace bullying, and asking for information about what the next steps would be concerning her complaints.

72.     On April 26, 2016, Kathleen provided BOCES with a doctor's note, in which it was advised that Kathleen take medical leave for three to four weeks, based upon severe workplace stress, and physical manifestations for the same.

73.     Immediately after starting medical leave, Kathleen received a registered letter from Knight in response to the DASA Complaint. The letter acknowledged receiving the complaint and directed Kathleen to come to Knight's office on the day she returns to work, to meet with BOCES legal counsel and to discuss allegations made in the Employee Reporting form. It also included directives to bring copies of documents associated with the claims against Amelio. Kathleen thought the purpose of the letter was to further harass and threaten her while she was home taking protected leave.

74.     Due to medical complications, which delayed recovery, Kathleen had to extend her protected leave.

75.     On June 13, 2016, Kathleen returned from medical leave.

76.      Following her return, Kathleen was immediately subjected to a pattern and practice of increased scrutiny from Schuchman. Notably, at this stage in the School Year, observations are unnecessary, because the sessions could no longer be "signed off" for. Instead, Schuchman's practice of continuously showing up for observations upon Kathleen's return served as a means to increasingly harass Kathleen, shortly after her taking of medical leave.

77.     On June 13, 2016, Kathleen emailed Knight, Assistant Superintendent Gratto and Superintendent Coles, reporting the continuation of Director Schuchman's bullying, following her return from taking protected leave. Kathleen stated that the due to the ongoing campaign of bullying, it was in her best interest to have legal representation for the mandatory meeting with Knight and the BOCES legal counsel.

78.     BOCES refused Kathleen the ability to bring legal representation to the meeting.

79.     On June 15, 2016, Director Schuchman and Amelio came to observe Kathleen. Kathleen was already in the process of taking medical leave due to increasing health concerns related to the increased campaign of bullying by Director Schuchman.

80.     Kathleen emailed Knight, Gratto and Superintendent Coles notifying them that the bullying by Director Schuchman was continuing and requesting intervention to stop the harassment.

81.     On June 24, 2016, the last day of the school year, and following her return from protected medical leave, Director Schuchman and Supervisor Walker again issued Kathleen a Counseling Memorandum with an incorrect date of April 12, 2016. Upon

information and belief, this action was in retaliation for Kathleen's taking of protected leave.

82.    Notably, a Counseling Memorandum is issued for the alleged purpose of providing instruction. Here, Director Schuchman issued Kathleen a Counseling Memorandum on the last day of the 2015/16 School Year, and after Kathleen had submitted her retirement papers.  As such, there could not be intent to provide instruction. Instead, this Counseling Memorandum was issued to further harass and retaliate against Kathleen.

83.    As a result of Southern Westchester BOCES' failure to investigate her repeated allegations of disparate treatment in the workplace, or to protect her from continued retaliation, Kathleen was subjected to a hostile work environment tantamount to a constructive termination.

84.    On June 30, 2016, after serving as an educator for over thirty years, Kathleen retired from her employment with Southern Westchester BOCES.  Upon information and belief, the delay in the investigation of her repeated and long-standing complaints concerning a hostile work environment and workplace bullying were intended to motivate this constructive termination.

85.    On March 3, 2017, Kathleen filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that Defendant had engaged in unlawful discriminatory practices.

86.    During the scope of the NYSDHR investigation of Kathleen's allegations of discrimination and retaliation, BOCES awarded retro pay. Upon information and belief, the retro pay was based on the 2015/16 School Year; however BOCES chose to credit the

retro pay to the 2016/17 School Year. Upon information and belief, this was intended to further subject Kathleen to economic injury, as she would be among the only retirees who would be impacted by the 2016/17 School Year credit.

87.     On August 31, 2017, the NYSDHR determined that *probable cause* exists to believe the District has engaged in or is engaging in the unlawful discriminatory practices complained of by Kathleen.

88.     In or around December 2017, the retro pay was applied. Kathleen, who had been a working member of BOCES during the applicable period, was denied, as the credit was applied for the 2016/17 School Year.

89.     On May 14, 2018, and at Plaintiff's request, Kathleen's NYSDHR case was dismissed by the Division for administrative convenience, so that she could pursue claims in Federal court.

90.     On June 20, 2018, Kathleen received her Dismissal and Notice of Rights from the EEOC, allowing her to commence this instant action.

## CLAIMS FOR RELIEF

91.     As set forth above, Defendant BOCES violated 42 U.S.C. § 1983, including, but not limited to, by engaging in unlawful discriminatory practices by its policymakers in intentionally committing, condoning, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

92.     As set forth above, individual Defendants Dr. Harold Coles (Superintendent), James Gratto (Assistant Superintendent), David Pulley (Assistant Superintendent), Lisa Schuchman (Director of Special Education), John Knight (Title IX Officer), violated 42 U.S.C. § 1983, including, but not limited to, by engaging in unlawful discriminatory

practices in intentionally committing, condoning, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

93.     As set forth above, Defendant BOCES violated § 296, et. seq. of the New York State Human Rights Law, including, but not limited to, by engaging in unlawful discriminatory practices in intentionally committing, condoning, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

94.     As set forth above, Defendant BOCES has subjected Plaintiff to discrimination and retaliation in the form of adverse employment actions because of her disability/perceived disability and/or her opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., Americans with Disabilities Act, 42 U.S.C. 12111, et seq., the New York State Executive Law §290 et seq., New York State Executive Law, Human Rights Law, § 296, et seq.

95.     As set forth above, the individual Defendants violated § 296(6) of the New York State Human Rights Law, including, but not limited to, engaging in unlawful discriminatory practices in aided, abetted, incited, compelled, coerced and/or participated in the aforementioned unlawful conduct in violation of New York State Executive Law, Human Rights Law § 296(6).

96.     As set forth above, the individual Defendants subjected Plaintiff to discrimination and retaliation in the form of adverse employment actions because of her disability/perceived disability and/or her opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., Americans with Disabilities Act, 42 U.S.C. 12111, et seq., the New York State

Executive Law §290 et seq., New York State Executive Law, Human Rights Law, § 296, et seq.

## DEMAND FOR A JURY TRIAL

97.     Plaintiff demands a trial by jury of all issues and claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

98.     Demand a jury trial on these issues to determine liability and damages;

99.     A judgment declaring that the practices complained of herein are unlawful;

100.     All damages, including without limitation liquidated damages, which Plaintiff has sustained as a result of Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' improper practices;

101.     All damages which the Plaintiff has sustained as a result of Defendants' conduct, including general and special damages for job benefits she would have received but for Defendants' improper practices;

102.     An award to Plaintiff of compensatory damages, including but not limited to damages for emotional pain and suffering where appropriate;

103.     Awarding the Plaintiff compensatory damages including, but not limited to, damages for pain and suffering, humiliation, embarrassment and damage to reputation, character, and standing within the community;

104.     Exemplary and punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, reckless, and/or intentional acts where appropriate and permitted by law;

105.    Awarding Plaintiff costs and disbursements incurred in connection with this action together with interest at the statutory rate;

106.    Awarding Plaintiff reasonable attorneys' and expert witness fees, and other costs;

107.    Pre-judgment and post-judgment interest, as provided by law; and

108.    Granting Plaintiff other and further relief as this Court finds necessary and proper.


Dated: Carle Place, New York
       September 18, 2018

                                        Respectfully submitted,

                                        LEEDS BROWN LAW, P.C.
                                        *Attorneys for Plaintiff*
                                        One Old Country Road, Suite 347
                                        Carle Place, New York 11514
                                        (516) 873-9550

                                        By: _____/s/_____
                                                    SEAN O'HARA