UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KATHLEEN O'HARA,

                        Plaintiff,

            -against-

BOARD OF COOPERATIVE EDUCATIONAL SERVICES,
SOUTHERN WESTCHESTER; HAROLD COLES, JAMES
GRATTO, DAVID PULLEY, LISA SCHUCHMAN, and
JOHN KNIGHT, in their official and individual capacities.

                        Defendants.
------------------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT**

Jury Trial Demanded

Case No.: 18-CV-8502

Plaintiff, KATHLEEN O'HARA, by and through her attorneys, Leeds Brown Law, P.C.,

as and for her complaint against the Defendants herein, alleges, upon personal knowledge and

upon information and belief as to all other matters:

## JURISDICTION AND VENUE

1.      This action is brought against Defendant, Board of Cooperative Educational

Services, Southern Westchester, for its violations of the Fourteenth Amendment to the

United States Constitution (as enforced by 42 U.S.C. § 1983); Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., the Americans with Disabilities

Act, 42 U.S.C. 12111, et seq., and any other cause of action which can be inferred from

the facts set forth herein.

2.      This action is brought against individual Defendants Dr. Harold Coles (District

Superintendent), James Gratto (Assistant Superintendent), David Pulley (Assistant

Superintendent), Lisa Schuchman (Director of Special Education), and John Knight (Title

IX Officer) (hereinafter "individual Defendants"), in their official and individual

capacities, for their violations of the Fourteenth Amendment to the United States

Constitution (as enforced by 42 U.S.C. § 1983); and any other cause of action which can be inferred from the facts set forth herein.

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331. The supplemental jurisdiction of this Court is invoked over state causes of action pursuant to 28 U.S.C. § 1367.

4.      Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the action, including the unlawful employment practices alleged herein, occurred in this district.

5.      Following a "probable cause" determination by the New York State Division of Human Rights, Plaintiff received her Dismissal and Notice of Rights from the Equal Employment Opportunity Commission, dated June 20, 2018.

6.      Any and all other prerequisites to the institution of this action have been met.

## PARTIES

7.      Plaintiff, Kathleen O'Hara ("Plaintiff" or "Kathleen"), during all relevant times, was and remains a resident of Westchester County, State of New York.

8.      Defendant, Board of Cooperative Educational Services, Southern Westchester ("BOCES"), at all times hereinafter mentioned, was and still is a public-school district organized under the laws of the State of New York with its principal place of business at 17 Berkley Drive, Rye Brook, New York 10573. Defendant is the entity that is in control of the school referenced in the body of this Complaint. The District is an "Employer" as defined by all relevant statutes.

9.      The individual Defendants are policymakers for the District, and are named in their official and individual capacities. The principal place of business for the individual

Defendants is 17 Berkley Drive, Rye Brook, New York 10573.  To date, affidavits of service have been executed for the individual Defendants.

## STATEMENT OF FACTS[1]

10.     In October 1988, Kathleen O'Hara ("Kathleen") began working for BOCES as a full-time Teacher of the Speech and Hearing Handicapped ("TSHH").

11.     During her employment, and while serving BOCES as a TSHH, Kathleen continued her education and professional development, earning a Master of Arts in Speech and Language Pathology, a clinical license as a Speech and Language Pathologist for New York State, a Certificate of Clinical Competence ("CCC") from the American Speech and Hearing Association ("ASHA"), and a Certificate in Assistive Technology.

12.     During her employment with BOCES, Kathleen experienced or continued to experience medical diagnoses concerning conditions impacting her gastrointestinal tract, her heart and pulmonary system, and her lungs.

13.     Kathleen suffers from gastrointestinal conditions including, but not limited to, Irritable Bowel Syndrome ("IBS"), hiatal hernia, gastritis, gastroesophageal reflux disease ("GERD"), as well as ulcers which cause debilitating pain.  These conditions interfered with Kathleen's sleep, as a result of severe abdominal pain.

14.     In addition, Kathleen suffers from mitral valve prolapse, a heart valve condition which can cause symptoms of irregular heartbeat, palpitations, and shortness of breath. As a result of this condition, Kathleen experiences sharp and stabbing chest pain which doctors have advised may be linked to her valve condition.

---

[1] To the extent that any factual assertions are untimely, they are included for the purposes of providing a chronological narrative of the underlying complaints, as they relate to the timely allegations contained herein.

15.     Kathleen's breathing is also impacted by her diagnosis of reactive asthma, also known as reactive airway disease, a lung condition in which the lungs react to infection with symptoms including coughing, wheezing, and shortness of breath.

16.     Kathleen's diagnosed medical conditions are exacerbated by stress, which causes crippling gastrointestinal and chest pain, as well as inability to sleep.

17.     Throughout her employment with BOCES, Kathleen's medical conditions were known to BOCES, as well as to Kathleen's supervisors, in that Kathleen discussed her conditions with supervisors, including by making complaints about painful symptoms.

18.     Over 28 years of employment with BOCES, Kathleen built a career of excellent service providing speech and language therapy to lower functioning children with a specialty area of designing and adapting augmentative communication systems for nonverbal students.

19.     Kathleen continued to receive favorable performance evaluations for her work.

20.     In or around the 2010/11 School Year, Kathleen began experiencing increasing pressure from supervisors to use her clinical license to "sign off" on services provided to students, so that BOCES could enable their component School Districts to bill Medicaid for therapy.

21.     Though she was hired as a teacher, and was serving as a TSHH, Kathleen experienced extreme pressure to "sign off" with her clinical license. The action of "signing off" confirms from a clinical standpoint that services were provided in a manner which adheres to the rules and regulations set forth by Medicaid, enabling BOCES' component School Districts to be able to bill for Medicaid reimbursement.

22.     In investigating the matter, Kathleen discovered that her colleague, Marlane Amelio ("Amelio"), had falsely been "signing off" on Service Recommendations by stating that Kathleen was acting "under the direction of" Amelio. Kathleen complained to then-Director Mary Ellen Betzler and other staff, including a compliance specialist, Ana Reluzco, about the Service Recommendations, which Kathleen asserted were false. However, no action was taken.  In at least one instance, Kathleen discovered that her name had been signed on the document, while others contained printed use of Kathleen's name, with clinical credentials added.

23.     Instead, Kathleen was told that she was to use her clinical license to "sign off" on therapy sessions, even though they did not meet the standard for Medicaid billing, or that Amelio would "come to [her] sessions." This was a continuous threat for the remainder of Kathleen's career at BOCES.

24.     Thereafter, and continuing through the conclusion of the 2015/16 School Year, Kathleen was subjected to a disparately heavy caseload and associated workload, in comparison to her colleagues.

25.     While serving as a TSHH, and continuing through the 2015/16 School Year, Kathleen voiced opposition to the use of her clinical license to "sign off" on Medicaid billing, where services did not meet the clinical standard.  In sum, while billing was being submitted for a clinical level, services were not being provided which adhered to the necessary clinical standard.

26.     As a result of her complaints concerning the failure to meet the clinical standard, Kathleen began receiving impossible workloads, involuntary transfers, assignments

outside of her scope of practice, and inadequate travel time to arrive to locations within BOCES' territory to provide services to students.

27.     In or around the 2012/13 School Year, and despite being involuntary transferred on numerous occasions; Kathleen sought and was denied a transfer. Kathleen requested the transfer due to repeated acts of physical violence by students that Kathleen experienced at BOCES' Rye Lake campus.

28.     At the time of her transfer requests, there were open cases, which Kathleen had previous experience with, and would have allowed Kathleen's seamless transfer.

29.     Instead, BOCES denied Kathleen's transfer request, and let the cases remain unassigned.

30.     As a result of the failure to transfer, Kathleen suffered 2 fractures, 2 concussions, and repeated incidents of being bitten, struck, and choked by students, while working at the Rye Lake campus.

31.     Kathleen filled out Line of Duty Injury ("LODI") forms relating to each incident of injury, formally placing BOCES on notice of each incident.

32.     Following these injuries, and her complaints to Supervisor Will Guterman ("Guterman") about the assignments and lack of support, Kathleen was subjected to increased workplace bullying and hostility.

33.     Kathleen's TSHH colleagues, who had not sustained workplace injuries, or voiced opposition to dangerous workplace placement, were not subjected to a hostile work environment.

34.     Kathleen voiced repeated opposition to her excessive workload, but no relief was provided.

35.    During the 2011/12 School Year, Kathleen's Assistant Director, Michael Schulman, acknowledged that her caseload was too heavy. However, Supervisor Guterman assigned Kathleen an even heavier caseload for the 2012/13 School Year. Upon information and belief, this was an attempt to further subject Kathleen to a hostile work environment, and to retaliate against her for her prior complaints.

36.    In January 2013, Kathleen reported Guterman's workplace bullying to Assistant Superintendent Sheila McGuinness, as well as to District Superintendent Dr. Harold Coles ("Coles"), who was also then-serving as the District's Title IX representative. However, no relief was provided.

37.    In or around June 2013, and because of lack of response from her January 2013 complaint, Kathleen requested to meet with and met with Superintendent Coles concerning her allegations of workplace bullying by Guterman. Dr. Coles did not appear to investigate the situation and did not request any further information from Kathleen.

38.    Following her complaints to Superintendent Coles, Kathleen faced even greater increases to her caseload, and a significant increase in a practice of adding and transferring students in her care.

39.    Around the beginning of the 2014/15 School Year, BOCES hired Lisa Schuchman ("Schuchman") as an Assistant Director overseeing Kathleen.

40.    Notably, and upon information and belief, prior to coming to BOCES, Schuchman had previously been suspended or left two prior positions due to issues concerning allegations of workplace bullying, as well as failure to mitigate issues concerning student bullying.

41.     Additionally, following the arrival of Schuchman, and continuing through the conclusion of the 2015/16 School Year, and in the context of weekly meetings attended by Schuchman as Assistant Director (as well as Director upon that promotion), Title IX/EEOC Compliance Officer John Knight, Assistant Superintendent James Gratto ("Gratto"), and other administrators, as well as roughly seven to eleven principals, repeated comments were made concerning Kathleen's taking of sick leave. Such comments include, but are not limited to: that Kathleen was always sick, that she took a lot of time off, that she was always on medical leave, and that her sick days and medical leave were a hardship. As these comments were continuous, no corrective action was taken.

42.     In Fall 2014, Kathleen suffered another concussion from a student attack. As a result, she was required to take medical leave for treatment.

43.     Kathleen filled out her LODI materials, notifying her employer of the attack.

44.     Thereafter, Kathleen was diagnosed with Post-Concussion Syndrome. BOCES was provided with medical paperwork confirming this diagnosis.

45.     On December 1, 2014, Kathleen complained via email to Assistant Director Schuchman, advising her supervisor that her new schedule was in violation of her contract, as well as providing inadequate time to drive to provide therapy to students.

46.     Specifically, Kathleen complained that having nine sessions per day of thirty minutes violated a 250-minute maximum on services provided per day, in violation of her contract. Upon information and belief, these increases in scheduling were further intended to harass Kathleen, and target her for taking protected medical leave.

47.     On or around December 22, 2014, Kathleen was directed to meet with Assistant Superintendent David Pulley ("Pulley"), who was serving as the BOCES Medicaid Compliance Officer. During the meeting, Pulley used threatening terminology to make false allegations to intimidate Kathleen. At the end of the meeting, Pulley told Kathleen that if any session that Kathleen performed lasted less than 30 minutes, he would recommend that charges be filed against Kathleen, which could subject her to penalties up to and including termination.

48.     Notably, Kathleen was required to provide diligent records concerning her service times, as per her licensure.

49.     Kathleen was assigned to provide for back-to-back sessions for students who were on different floors and at times in different buildings, rendering service time less than 30 minutes, as time was required for transportation of students, who were incapable of traveling to their locations without adult assistance. Kathleen was also instructed by Assistant Superintendent Pulley and Supervisor Guterman to include the travel time in the billing.

50.     Upon information and belief, these schedules and time requirements were intended to set Kathleen up to fail, and to further harass and intimidate her.

51.     Kathleen complained about these scheduling issues, but no action was taken to address her complaints.

52.     On January 19, 2015, Kathleen complained to Superintendent Coles concerning Assistant Superintendent Pulley's intimidation, specifically advising that she was being subjected to workplace bullying, as well as threats concerning her employment.

53.     On or around February 12, 2015, and following her complaints, Kathleen discovered that falsified notes, which included disparaging comments about Kathleen and her work as a therapist, had been entered into her students' electronic files. Upon information and belief, these falsified statements, made by Amelio, were further intended to harass and intimidate Kathleen.

54.     Kathleen complained about these falsified revisions to Assistant Superintendent/Medicaid Compliance Officer Pulley. Pulley failed to take action to address the falsified Medicaid notes. Upon information and belief, these notes were designed to discredit Kathleen's work, placed Kathleen's licenses in jeopardy, and further intended to harass Kathleen.

55.     On or around March 11, 2015, and almost immediately after she complained, Kathleen was advised that the District wanted to assign additional students to her caseload. Kathleen had been complaining throughout the 2014/15 School Year about being overloaded, but no action had been taken to alleviate her complaints. Now, she was being told that BOCES wished to increase her caseload again.

56.     On or around May 5, 2015, Kathleen contacted Assistant Superintendent Gratto and requested a meeting to discuss ongoing workplace harassment and bullying.

57.     In response, Assistant Superintendent Gratto advised Kathleen that he and Assistant Superintendent Pulley could meet with Kathleen, but that she would need documentation in support of her complaints, and advised her that she needed to bring union representation to the meeting. Upon information and belief, the inclusion of union representation, which is required during any disciplinary matter, was intended to result in a chilling effect on Kathleen's continued complaints.

58.     Ultimately, neither Gratto nor Pulley took further action to investigate Kathleen's allegations, provide support, or prevent the continued practice of workplace harassment and bullying.

59.     Beginning in September 2015, and continuing throughout the 2015/16 School Year, Kathleen experienced a change in the manner in which she was observed. Direct supervisors traditionally complete observations; however, Assistant Director Schuchman told Kathleen she was assigning Amelio to observe Kathleen's sessions. Amelio, who had been the subject of Kathleen's prior complaints, now had the ability to have continued access to Kathleen's students' files and "sign off" under Kathleen's name. Although Kathleen has the credentials to "sign off" for Medicaid billing, she voiced opposition to any practices concerning use of such credentials to "sign off" for services which did not meet the criteria required, including but not limited to, having a non-treating therapist endorsing Medicaid reimbursement. Upon information and belief, this was further intended to create a hostile work environment for Kathleen and jeopardize her professional licenses.

60.     As a result of the workplace stress she was experiences, Kathleen experienced physical manifestations including chest pains linked to her mitral valve prolapse and her heart, and requiring repeated visits to a cardiologist in November and December 2015.

61.     At the start of the 2015/16 School Year, Kathleen was again subjected to an involuntary transfer to Rye Lake Campus. Notably, this was the location of Kathleen's prior injuries, and her prior requests to transfer. Upon information and belief, this involuntary transfer was unnecessary, and intended to further harass Kathleen. The Rye

Lake Campus is also the location of Schuchman's office, which made daily encounters more common.

62.    As a result of the continued harassment and workplace retaliation she was experiencing, Kathleen began suffering severe gastrointestinal distress, including ulcers, which required medical care, and required Kathleen take repeated sick days. Kathleen was advised by her doctors that her condition was impacted by workplace-related stress.

63.    Additionally, throughout the 2015/16 School Year, Kathleen was repeatedly contacted by Assistant Director Schuchman and her secretary, who made repeated demands for Kathleen's schedule. These demands often came while Kathleen was taking sick leave relating to her workplace stress and anxiety, and their physical manifestations requiring such leave.

64.    In or around January 2016, Schuchman became Director of the Special Education Division, increasing her authority over Kathleen.

65.    For the duration of the 2015/16 school year, and continuing to her retirement, Kathleen experienced an increase in her stress-related manifestations of her diagnosed conditions, causing intense stomach pain caused by gastritis and ulcers, and painful spasms caused by IBS.  These issues remained continuous throughout the remainder of the 2015/16 School Year, and caused Kathleen to experience the most extensive and continuous physical manifestations of her conditions, as well as requiring repeated visits to doctors concerning her heart and gastrointestinal conditions.

66.    On January 12, 2016, Kathleen emailed newly-hired Supervisor Jessica Walker ("Walker") concerning the disparately large size of her schedule.

67.     Supervisor Walker, who is an ASHA Certified Speech and Language Pathologist, possessed the ability to oversee Kathleen's services, rendering Amelio's participation in Kathleen's services unnecessary.

68.     Immediately thereafter, Schuchman assigned another student to Kathleen. Upon information and belief, this assignment was made to further antagonize Kathleen, and to retaliate against her for her taking of protected leave.

69.     On or around February 2, 2016, Kathleen complained to Schuchman about being assigned High School students, who were outside of her scope of practice.

70.     On or around February 3, 2016, Kathleen was assigned another High School student.

71.     On February 9, 2016, Kathleen took a sick day. While out sick, Kathleen was contacted on her emergency number, as provided to BOCES. Upon information and belief, this unnecessary communication was intended to further harass Kathleen while she was taking sick leave.

72.     On February 11, 2016, Supervisor Walker came to Kathleen's office and announced that Amelio would be joining her to observe, in contrast to District practices concerning observations not being performed after sick days. Kathleen contacted Superintendent Coles, specifically complaining about the continued hostile work environment.

73.     On February 11, 2016, Kathleen complained about a "hostile environment" which was causing her "agitation and stress," and advised that physical manifestations of stress and anxiety required her to take sick leave.  Kathleen sent this complaint to the attention

of Superintendent Coles and Assistant Superintendent Gratto, as well as her immediate supervisor Schuchman.

74.     On February 11, 2016, Kathleen went home sick, due to physical manifestations of workplace stress and anxiety. Prior to leaving sick, Kathleen emailed Schuchman, Superintendent Coles, and Assistant Superintendent Gratto, and advised them of her need to take a sick day.

75.     That evening, on February 11, 2016, Schuchman responded to Kathleen, stating "Thank you for this email. I will forward it to James Gratto." Upon information and belief, this was intended to deride Kathleen's inclusion of Assistant Superintendent Gratto in her prior complaints concerning a hostile work environment and workplace harassment, as well as her taking of medical leave that day.

76.     On March 1, 2016, Kathleen was called into a meeting with Walker and Schuchman. Kathleen reiterated her complaints that co-worker Amelio had been entering student electronic files, back dating notes, making false and disparaging comments and signing off on as an "UDO", indicating that work was performed "under the direction of" Amelio. Kathleen reported that Amelio had already signed off on a student for the current year, despite having never conducted any observation of the student, and without having any direct knowledge concerning the students' needs.

77.     Director Schuchman ignored Kathleen's complaints. In fact, later that day, on March 1, 2016, Schuchman assigned Walker and Amelio to conduct an observation of Kathleen's student sessions.

78.     On March 4, 2016, Kathleen was issued a counseling memorandum concerning allegations of insubordination.  Notably, it was inaccurately alleged that Kathleen was

uncooperative at the March 1, 2016 meeting. Upon information and belief, this Counseling Memorandum was intended to further target and retaliate against Kathleen.

79.     During the meeting, Schuchman issued Kathleen a counseling memorandum. Kathleen responded that she was being bullied, and again indicated specifically that she was being subjected to a "hostile work environment."

80.     On March 4, 2016, Kathleen followed up on her complaints of workplace bullying. She was advised by Title IX Officer John Knight ("Knight") that Assistant Superintendent Gratto was handling these allegations.

81.     On March 7, 2016, Kathleen contacted Assistant Superintendent Gratto, advising him that she was being "bullied" by her administration, and that her health was being impacted, and asked Gratto to take action to stop the harassment.

82.     On or around March 7, 2016, Kathleen saw a gastroenterologist in relation to stress-related manifestations of her medical conditions, which caused her to experience physical manifestation of her gastrointestinal conditions, including IBS, gastritis, GERD.

83.     On March 18, 2016, Kathleen submitted a response to the allegations in the Counseling Memorandum, and complained that she was being penalized as a result of becoming sick, as well as that the stress was negatively impacting her health.

84.     On or around March 23, 2016, Kathleen was required to take a sick day for gastrointestinal testing, relating to physical manifestation of her gastrointestinal conditions, including IBS, gastritis, and GERD, causing Kathleen severe stomach pain.

85.     On March 28, 2016, Kathleen submitted a complaint under the Dignity for All Students Act ("DASA"), as applied to BOCES by the Dignity for All: Employee Reporting form, further memorializing her complaints concerning workplace bullying.

86.     DASA complaints are required to be investigated immediately. However, Kathleen's complaints were not investigated in a timely fashion.

87.     On April 11, 2016, Kathleen was scheduled for an endoscopy, with prior notice for her need for medical leave provided to Kathleen's administration. Kathleen was newly diagnosed with ulcers during this endoscopy, further demonstrating that the workplace stress was causing physical manifestations. Despite her prior notice, Kathleen was written up for being out sick while undergoing a serious medical procedure.

88.     On April 12, 2016, Kathleen emailed Assistant Superintendent Gratto to report that the stress of the situation was making her sick and that she was going home. She also asked that he follow-up on her complaint that she was being bullied, and again advised that her health was being impacted. Shortly thereafter, Kathleen was contacted by Title IX/EEOC Compliance Officer Knight, who confirmed that Human Resources Director/Assistant Superintendent Gratto had sent Knight the information concerning Kathleen's complaints. Kathleen believed that BOCES was engaging in behavior to delay the investigation of her complaints, and that her employer was not taking any action in response to her allegations.

89.     On or around April 12, 2016, Kathleen was issued a second Counseling Memorandum from Schuchman, alleging that she had engaged in insubordination, and further suggesting that Kathleen was not sick.  Upon information and belief, this was further intended to harass and retaliate against Kathleen for taking protected medical leave.

90.     On April 14, 2016, Kathleen was assigned a new high school student who was outside Kathleen's scope of practice. The scope of practice describes the services that a

healthcare practitioner is permitted to undertake under the terms of their professional license. Upon information and belief, this assignment was in retaliation for Kathleen's taking of protected leave.

91. Kathleen was given a copy of the Counseling Memorandum concerning her April 11, 2016 medical leave. Subsequently, Kathleen received an email from Director Schuchman that Schuchman and Amelio would be physically coming to monitor Kathleen every day that week.

92. After receiving these messages, Kathleen reached out to Gratto and Knight, inquiring about the status of her complaints of workplace bullying, and asking for information about what the next steps would be concerning her complaints.

93. On Tuesday, April 19, 2016, Kathleen took a sick day, due to medical issues concerning physical manifestations of stress, including her gastrointestinal disorders.

94. That day, Schuchman emailed Kathleen, telling her "I see you are out again today. I will plan on being there both Thursday and Wednesday to make up."

95. Upon information and belief, this was intended to reference the conducting of back-to-back observations on Wednesday, April 20, 2016, and Thursday, April 21, 2016, and was intended to harass Kathleen for her taking of sick leave.

96. On Wednesday, April 20, 2016, Kathleen continued her sick leave, due to the same gastrointestinal issues.

97. That day, Schuchman emailed Kathleen, stating "I see you are out again today. Please plan on [Amelio] and I being there Thursday and Friday."

98.     Upon information and belief, this was intended to reference the conducting of back-to-back observations on Thursday, April 21, 2016, and Friday, April 22, 2016, and was intended to harass Kathleen for her taking of sick leave.

99.     On April 21, 2016, Kathleen continued her sick leave.

100.    That day, she contacted Superintendent Coles, as well as Title XI Officer Knight, advising them that she was being subjected to "bullying" by Schuchman and Amelio, who were the subject of her DASA complaint.   Kathleen voiced opposition to "retaliation", and asked that Schuchman stop "this campaign of bullying", which was "affecting [Kathleen's] health."

101.    On April 26, 2016, Kathleen provided BOCES with a doctor's note, which requested that Kathleen take medical leave for three to four weeks, based upon severe workplace stress, and physical manifestations for the same.

102.    Notably, this doctor's note confirmed that Kathleen was:

    "currently under severe stress from her work related issues and has required multiple visits to the gastroenterologist because of recurring abdominal pain and the appearance of esophageal ulcers and gastritis.  In spite of multiple medications, she continues to suffer with pain and I have advised her that a medical leave of absence from work for a period of at least 3-4 weeks may be in order for her abdominal symptoms and ulcers to heal."

103.    Immediately after starting medical leave, on or around April 28, 2016, Kathleen received a registered letter from Knight in response to the DASA Complaint. The letter acknowledged receiving the complaint and directed Kathleen to come to Knight's office on the day she returns to work, to meet with BOCES' legal counsel and to discuss allegations made in the Employee Reporting form. It also included directives to bring copies of documents associated with the claims against Amelio. Kathleen believed the

purpose of the letter was to further harass and threaten her while she was home taking protected leave.

104.     Due to medical complications, which delayed recovery, Kathleen had to extend her protected leave.

105.     On June 13, 2016, Kathleen returned from medical leave, after having experienced months of continuous symptoms.

106.     Following her return, Kathleen was immediately subjected to a pattern and practice of increased scrutiny from Schuchman. Notably, at this stage in the School Year, observations are unnecessary, because the sessions could no longer be "signed off" for. Instead, Schuchman's practice of continuously showing up for observations upon Kathleen's return served as a means to increasingly harass Kathleen, shortly after her taking of medical leave.

107.     On June 13, 2016, Kathleen emailed Knight, Assistant Superintendent Gratto and Superintendent Coles, reporting the continuation of Director Schuchman's bullying, following her return from taking protected leave. Kathleen stated that the due to the ongoing campaign of bullying, it was in her best interest to have legal representation for the mandatory meeting with Knight and the BOCES legal counsel.

108.     BOCES refused Kathleen the ability to bring legal representation to the meeting.

109.     That day, on June 13, 2016, Schuchman told Kathleen that Amelio would be in Kathleen's class observing her all week.

110.     On June 15, 2016, Director Schuchman and Amelio came to observe Kathleen. Kathleen was already in the process of taking medical leave due to increasing health concerns related to the increased campaign of bullying by Director Schuchman.

111.    Kathleen emailed Knight, Gratto and Superintendent Coles notifying them that the bullying by Director Schuchman was continuing and requesting intervention to stop the harassment.

112.    On June 17, 2016, Kathleen again reached out to Knight, copying Gratto and Superintendent Coles, and referenced the lack of action taken since her March 7, 2016 complaint to Assistant Superintendent Gratto, her complaints that her concerns were not investigated, as well as the negative impact taken on her health.

113.    On or around June 22, 2016, and during a meeting with Title IX Officer Knight, as well as BOCES Human Resources, Kathleen provided her letter of resignation, advising that she was doing so due to constant harassment and retaliation.

114.    On June 24, 2016, the last day of the school year, and following her return from protected medical leave, Director Schuchman and Supervisor Walker again issued Kathleen a Counseling Memorandum with an incorrect date of April 12, 2016. Upon information and belief, this action was in retaliation for Kathleen's taking of protected leave.

115.    Notably, a Counseling Memorandum is issued for the alleged purpose of providing instruction. Here, Director Schuchman issued Kathleen a Counseling Memorandum on the last day of the 2015/16 School Year, and after Kathleen had submitted her retirement papers.  As such, there could not be intent to provide instruction. Instead, this Counseling Memorandum was issued to further harass and retaliate against Kathleen.

116.     As a result of BOCES' failure to investigate her repeated allegations of disparate treatment in the workplace, or to protect her from continued retaliation, Kathleen was subjected to a hostile work environment tantamount to a constructive termination.

117.     On June 30, 2016, after serving as an educator for over thirty years, Kathleen effectively retired from her employment with BOCES.  Upon information and belief, the delay in the investigation of her repeated and long-standing complaints concerning a hostile work environment and workplace bullying were intended to motivate this constructive termination.

118.     On March 3, 2017, Kathleen filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that Defendant had engaged in unlawful discriminatory practices.

119.     During the scope of the NYSDHR investigation of Kathleen's allegations of discrimination and retaliation, BOCES awarded retro pay. Upon information and belief, the retro pay was based on the 2015/16 School Year; however, BOCES chose to credit the retro pay to the 2016/17 School Year. Upon information and belief, this was intended to further subject Kathleen to economic injury, as she would be among the only retirees who would be impacted by the 2016/17 School Year credit, as she had retired.

120.     On August 31, 2017, the NYSDHR determined that *probable cause* exists to believe the District has engaged in or is engaging in the unlawful discriminatory practices complained of by Kathleen.

121.     In or around December 2017, the retro pay was applied. Kathleen, who had been a working member of BOCES during the applicable period, was denied, as the credit was applied for the 2016/17 School Year.

122.    On June 20, 2018, Kathleen received her Dismissal and Notice of Rights from the EEOC, allowing her to commence this instant action.

123.    On September 18, 2018, Kathleen filed the underlying Complaint in this Instant Action.

124.    Throughout the respective charged periods, the Individual Defendants and BOCES failed to enforce policies which were alleged intended to protect employees like Kathleen, including but not limited to the following BOCES Policies:

    a.   Policy #1440 – Non-Discrimination;

    b.   Policy #2420 – Anti-Harassment;

    c.   Policy #5120 – Equal Employment Opportunity;

    d.   Policy #5170 – Complaints and Grievances by Employees.

125.    Upon information and belief, this failure to enforce BOCES' policies was intended to continue to discriminate against Kathleen, subject to a hostile work environment, lead to continued physical manifestations of workplace-related stress and anxiety, and force Kathleen from her tenured position with BOCES.

126.    Upon information and belief, the denial of these protections, as promised to other BOCES employees, was intended, at least in part, to retaliate against Kathleen for her frequent complaints concerning disparate treatment, misconduct, hostile work environment, workplace bullying, and conditions giving rise to discrimination.

127.    On December 21, 2018, Kathleen filed an amended complaint which identified additional allegations concerning BOCES' acts of further retaliation against Kathleen. In an abundance of caution, and to ensure that her rights are protected in relation to those claims, those matters have been removed from this instant second amended complaint,

and have been timely filed with the NYSDHR, and with applicable EEOC cross-filing, with a date stamped on March 13, 2019. Those complaints, as well as confirmation of that filing, are attached herein as **Exhibit "1"**.

## CLAIMS FOR RELIEF

128.    As set forth above, Defendant BOCES violated 42 U.S.C. § 1983, including, but not limited to, by engaging in unlawful discriminatory practices by its policymakers in intentionally committing, condoning, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

129.    As set forth above, individual Defendants Dr. Harold Coles (Superintendent), James Gratto (Assistant Superintendent), David Pulley (Assistant Superintendent), Lisa Schuchman (Director of Special Education), John Knight (Title IX Officer), violated 42 U.S.C. § 1983, including, but not limited to, by engaging in unlawful discriminatory practices in intentionally committing, condoning, or were deliberately indifferent to the aforementioned violations of Plaintiff's constitutional rights.

130.    As set forth above, Defendant BOCES has subjected Plaintiff to discrimination and retaliation in the form of adverse employment actions because of her disability/perceived disability and/or her opposition to discriminatory practices, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e et seq., Americans with Disabilities Act, 42 U.S.C. 12111, et seq.

## DEMAND FOR A JURY TRIAL

131.    Plaintiff demands a trial by jury of all issues and claims in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

132.    Demand a jury trial on these issues to determine liability and damages;

133.    A judgment declaring that the practices complained of herein are unlawful;

134.    All damages, including without limitation liquidated damages, which Plaintiff has sustained as a result of Defendants' conduct, including back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for Defendants' improper practices;

135.    All damages which the Plaintiff has sustained as a result of Defendants' conduct, including general and special damages for job benefits she would have received but for Defendants' improper practices;

136.    An award to Plaintiff of compensatory damages, including but not limited to damages for emotional pain and suffering where appropriate;

137.    Awarding the Plaintiff compensatory damages including, but not limited to, damages for pain and suffering, humiliation, embarrassment and damage to reputation, character, and standing within the community;

138.    Exemplary and punitive damages in an amount commensurate with Defendants' ability and so as to deter future malicious, reckless, and/or intentional acts where appropriate and permitted by law;

139.    Awarding Plaintiff costs and disbursements incurred in connection with this action together with interest at the statutory rate;

140.    Awarding Plaintiff reasonable attorneys' and expert witness fees, and other costs;

141.    Pre-judgment and post-judgment interest, as provided by law; and

142.    Granting Plaintiff other and further relief as this Court finds necessary and proper.

Dated: Carle Place, New York
       March 13, 2019

Respectfully submitted,

LEEDS BROWN LAW, P.C.
*Attorneys for Plaintiff*
One Old Country Road, Suite 347
Carle Place, New York 11514
(516) 873-9550

By: _____/s/_____
          SEAN O'HARA