UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KATHLEEN O'HARA,

                                    Plaintiff,

                    v.

BOARD OF COOPERATIVE EDUCATIONAL
SERVICES, SOUTHERN WESTCHESTER; *et
al.*,

                                    Defendants.

No. 18-CV-8502 (KMK)

OPINION & ORDER

---

Appearances:

Sean Michael O'Hara, Esq.
Leeds Brown Law, P.C.
Carl Place, NY
*Counsel for Plaintiff*

Caroline Beth Lineen, Esq.
Karen Chana Rudnicki, Esq.
Lewis R. Silverman, Esq.
Silverman & Associates
White Plains, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Kathleen O'Hara ("Plaintiff") brings this Action against Defendants Board of

Cooperative Educational Services, Southern Westchester ("BOCES") and certain of its

employees: Dr. Harold Coles, District Superintendent ("Coles"); James Gratto, Assistant

Superintendent ("Gratto"); David Pulley, Assistant Superintendent ("Pulley"); Lisa Schuchman,

Director of Special Education ("Schuchman"); and John Knight, Title IX Officer ("Knight").[1]

---

        [1] Collectively, Defendants other than BOCES are referred to as the "Individual
Defendants."  They are sued in both their official and individual capacities.

Plaintiff alleges violations of the Fourteenth Amendment; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq*.; and Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111, *et seq*., claiming that Defendants discriminated and retaliated against her based on her purported disability. Before the Court is Defendants' Motion To Dismiss the Second Amended Complaint (the "Motion"), pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Not. of Mot. (Dkt. No. 36).) For the reasons discussed below, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Second Amended Complaint ("SAC") (Dkt. No. 31), exhibits attached thereto, and other matters of which the Court may take judicial notice, and are taken as true for purposes of the instant Motion.

"New York Education Law § 1950 permits supervisory school districts in New York State to create boards of cooperative educational services . . . for the purpose of distributing the cost of certain educational services among school districts." *Gorton v. Gettel*, 554 F.3d 60, 61 (2d Cir. 2009).[2] BOCES, one such board, is based in Rye, New York. (Second Am. Compl. ("SAC") ¶ 8 (Dkt. No. 31).) All Individual Defendants are officials of BOCES. (*Id.* ¶¶ 8–9.)

In October 1988, Plaintiff began employment with BOCES as "a full-time Teacher of the Speech and Hearing Handicapped ("TSHH")" in a school administered by BOCES. (*Id.* ¶ 10.) Plaintiff was employed by BOCES for over 28 years, during which time she provided "speech

---

[2] The SAC imprecisely characterizes BOCES as "a public-school district organized under the laws of the State of New York." (SAC ¶ 8.) The distinction, however, between a standard "school district" and a "board of cooperative educational services" is immaterial to the disposition of the instant Motion.

and language therapy to lower functioning children" and developed a specialty in "designing and adapting augmentative communication systems for nonverbal students." (*Id.* ¶ 18.) While employed by BOCES, Plaintiff continued her professional development, earning a New York State clinical license as a speech and language pathologist, a Certificate of Clinical Competence ("CCC") from the American Speech and Hearing Association ("ASHA"), and a Certificate in Assistive Technology. (*Id.* ¶ 11.) Until approximately 2011, Plaintiff received "favorable performance evaluations for her work." (*Id.* ¶¶ 19–20.)

During her employment, Plaintiff was diagnosed with several medical conditions impacting her gastrointestinal tract, heart, and pulmonary system. (*Id.* ¶ 12.) In particular, Plaintiff suffers from irritable bowel syndrome, hiatal hernia, gastritis, gastroesophageal reflux disease, ulcers, mitral valve prolapse, and reactive asthma. (*Id.* ¶ 13–15.) These conditions interfere with Plaintiff's sleep and work, and cause severe pain, irregular heartbeat, palpitations, and shortness of breath. (*Id.*) These conditions, as well as the related symptoms, are exacerbated by stress. (*Id.* ¶ 16.) Throughout her employment with BOCES, Plaintiff discussed her conditions with her supervisors, often by making complaints about painful symptoms. (*Id.* ¶ 17.)

Beginning in the 2010-2011 academic year, Plaintiff "began experiencing increasing pressure from supervisors to use her clinical license to 'sign off' on services provided to students." (*Id.* ¶ 20.) Such "sign offs" would indicate that therapy services "were provided in a manner which adheres to the rules and regulations set forth by Medicaid," thus "enabling BOCES' component School Districts to . . . bill for Medicaid reimbursement." (*Id.* ¶ 21.) Plaintiff, however, had been "hired as a teacher" rather than a therapist, and she did not believe that the relevant services met the standard for Medicaid billing. (*Id.* ¶¶ 20, 23.)

After "investigating the matter," Plaintiff discovered that her colleague, Marlane Amelio ("Amelio"), had "falsely been signing off on Service Recommendations" by stating that Plaintiff was acting under her direction. (*Id.* ¶ 22.) Plaintiff also discovered several instances in which she believes her name or signature were used improperly. (*Id.*) "Plaintiff complained to then-Director Mary Ellen Betzler and other staff, including a compliance specialist, Ana Reluzco," about the perceived irregularities, but "no action was taken." (*Id.*) Instead, Plaintiff was instructed to use her clinical license to "sign off" on therapy sessions, "even though they did not meet the standard for Medicaid billing." (*Id.* ¶ 23.) Plaintiff was told that if she did not do so, Amelio would "come to [her] sessions." (*Id.*) Plaintiff explains that this "was a continuous threat for the remainder of [her] career at BOCES." (*Id.*)

From 2011 to the conclusion of the 2015-2016 academic year, Plaintiff continued to "voice opposition to the use of her clinical license to 'sign off' on Medicaid billing, where services did not meet the clinical standard." (*Id.* ¶ 25.) As a result, Plaintiff began "receiving impossible workloads, involuntary transfers, assignments outside of her scope of practice, and [was allotted] inadequate travel time [to reach service locations.]" (*Id.* ¶¶ 24, 26.) In fact, according to Plaintiff, during the 2011-2012 academic year, Assistant Director Michael Schulman ("Schulman"), acknowledged that Plaintiff's caseload was too heavy. (*Id.* ¶ 35.) Nevertheless, Supervisor Will Guterman ("Guterman") assigned Plaintiff an even heavier caseload for the following year. (*Id.*)

Additionally, during the 2012-2013 academic year, Plaintiff sought a transfer due to "repeated acts of physical violence by students" at a Rye Lake campus. (*Id.* ¶ 27.) Although Plaintiff had been involuntarily transferred several times, and several appropriate cases to which she might have been transferred remained unassigned, Plaintiff's transfer request was denied.

(*Id.* ¶ 27–29.)  Subsequently, Plaintiff suffered two fractures, two concussions, and "repeated incidents of being bitten, struck, and choked by students, while working at the Rye Lake campus."  (*Id.* ¶ 30.)  Plaintiff filled out appropriate forms for each incident of injury, "formally placing BOCES on notice of each incident."  (*Id.* ¶ 31.)  Plaintiff also complained to Guterman about the assignments and lack of support.  (*Id.* ¶ 32.)  Plaintiff was then "subjected to increased workplace bullying and hostility" by her colleagues.  (*Id.* ¶ 32–33.)

In January 2013, Plaintiff "reported Guterman's workplace bullying" to Assistant Superintendent Sheila McGuinness ("McGuinness"), as well as to Defendant Coles; however, "no relief was provided."  (*Id.* ¶ 37.)  In June 2013, Plaintiff requested to meet, and met, with Coles concerning her allegations of bullying by Guterman; however, Coles "did not appear to investigate the situation and did not request any further information."  (*Id.* ¶ 37.)  Once again, Plaintiff "faced even greater increases to her caseload, and a significant increase in a practice of adding and transferring students in her care."  (*Id.* ¶ 38)

In Fall 2014, Plaintiff suffered another concussion from an additional student attack, and was again required to take medical leave for treatment.  (*Id.* ¶ 42.)  Plaintiff was also diagnosed with "post-concussion syndrome," and again, Plaintiff notified her employer of the attack and the diagnosis using the appropriate forms.  (*Id.* ¶ 43–44.)

During the beginning of the 2014–2015 academic year, BOCES hired Defendant Schuchman as an Assistant Director overseeing Plaintiff.  (*Id.* ¶ 39.)  Throughout the following two years, "repeated comments" were made during weekly meetings attended by Schuchman, Defendant Knight, and several school principals about Plaintiff's taking of sick leave.  (*Id.* ¶ 41.)  Such comments included the assertions that Plaintiff was "always sick," that she "took a lot of

time off," that she "was always on medical leave," and "that her sick days and medical leave were a hardship." (*Id.*)

On December 1, 2014, Plaintiff sent an email to Schuchman complaining that her new schedule violated her contract and provided inadequate time to drive to the locations where she would provide therapy to students. (*Id.* ¶ 45.) On December 22, 2014, Plaintiff was directed to meet with Defendant Pulley, then serving as the BOCES Medicaid Compliance Officer. (*Id.* ¶ 47.) During the meeting, Pulley "used threatening terminology," made "false allegations" and informed Plaintiff that if any of her sessions "lasted less than 30 minutes, he would recommend that charges be filed against [her], which could subject her to penalties up to and including termination." (*Id.*) Plaintiff's assigned schedule, however, made rendering full sessions of 30 minutes impossible. (*Id.* ¶ 49.) Pulley and Guterman also instructed her to "include the travel time in the billing." (*Id.*)

On January 19, 2015, Plaintiff complained to Coles about Pulley's "intimidation," but "no action was taken to address her complaints." (*Id.* ¶¶ 51–52.) On February 12, 2015, Plaintiff discovered that "falsified notes," including "disparaging comments about [her] and her work as a therapist, had been entered into her students' electronic files." (*Id.* ¶ 53.) Plaintiff believes that these notes were made by Amelio, and were "intended to harass and intimidate" Plaintiff, to discredit her work, and to place her licenses in jeopardy. (*Id.* ¶¶ 53–54.) Although Plaintiff complained about the notes to Pulley, Pulley failed to take any responsive action. (*Id.* ¶ 54.) On March 11, 2015, almost immediately after her complaint to Pulley, Plaintiff was advised that BOCES wanted to assign additional students to her caseload. (*Id.* ¶ 55.)

On May 5, 2015, Plaintiff contacted Defendant Gratto and requested a meeting to "discuss ongoing workplace harassment and bullying." (*Id.* ¶ 56.) Gratto advised Plaintiff that

he and Pulley could meet with her, but that she would need documentation to support her complaints, and advised her to bring union representation to the meeting. (*Id.* ¶ 57.) Neither Gratto nor Pulley took further action to investigate Plaintiff's allegations. (*Id.* ¶ 58.)

Beginning at the start of the 2015–2016 academic year, Plaintiff experienced "a change in the manner in which she was observed." (*Id.* ¶ 59.) Whereas employees are usually observed by direct supervisors, Schuchman informed Plaintiff that Amelio (the subject of Plaintiff's prior complaints) had been assigned to observe Plaintiff's sessions; Amelio would thus have "continued access" to Plaintiff's students' files and the ability to "sign off" under her name. (*Id.*)

Plaintiff's increased workplace stress manifested physically in increased chest pains and severe gastrointestinal distress, including ulcers. (*Id.* ¶¶ 60, 62.) As a result, Plaintiff required repeated visits to a cardiologist in November and December 2015, and she was forced to take repeated sick days. (*Id.*) For the duration of the 2015–2016 academic year, and continuing into her retirement, the stress-related manifestations of Plaintiff's diagnosed conditions escalated, causing intense pain and necessitating repeated medical visits. (*Id.* at ¶ 65.)

Additionally, at the start of the 2015–2016 academic year, Plaintiff was again transferred against her wishes to Rye Lake Campus, the location of Plaintiff's prior injuries. (*Id.* ¶ 61.) Throughout the year, Schuchman and her secretary repeatedly contacted Plaintiff and made "repeated demands for [her] schedule." (*Id.* ¶ 63.) On January 12, 2016, Plaintiff emailed her recently-hired supervisor, Jessica Walker ("Walker"), to complain about her schedule and disproportionate workload. (*Id.* ¶ 66.) Immediately thereafter, Schuchman assigned Plaintiff an additional student. (*Id.* ¶ 68.) On February 2, 2016, Plaintiff complained to Schuchman about being assigned high school students, who were outside of her scope of practice, but the very next day she was assigned an additional such student. (*Id.* ¶¶ 69–70.).

On February 9, 2016, Plaintiff took a sick day. (*Id.* ¶ 71.) Two days later, Walker arrived at Plaintiff's office and announced that Amelio would be joining her to observe Plaintiff—despite a prior practice of not conducting observations after sick days. (*Id.* ¶ 72.) Plaintiff then went home sick due to physical manifestations of workplace stress and anxiety. (*Id.* ¶ 74.) As she was doing so, Plaintiff contacted Coles, Gratto, and Schuchman, complaining about a "hostile work environment" that was causing her "agitation and stress," and advising them of her need to take a sick day. (*Id.* ¶¶ 72–74.) That same evening, Schuchman responded to Plaintiff, stating "Thank you for this email. I will forward it to James Gratto." (*Id.* ¶ 75.)

On March 1, 2016, Plaintiff was called into a meeting with Walker and Schuchman, where she reiterated her complaints about Amelio's conduct, including back-dating notes, making false and disparaging comments, and improperly signing off on paperwork. (*Id.* ¶ 76.) Rather than responding to Plaintiff's complaints, Schuchman assigned Walker and Amelio to conduct an observation of Plaintiff's sessions later that day. (*Id.* ¶ 77.)

On March 4, 2016, Plaintiff was issued a counseling memorandum for insubordination, citing her alleged lack of cooperation at the March 1, 2016 meeting. (*Id.* ¶ 78.) The same day, Plaintiff sought to follow up on her complaints of workplace bullying, and Knight informed her that Gratto was handling her allegations. (*Id.* ¶ 80.) On March 7, 2016, Plaintiff contacted Gratto, explaining that she was being "bullied" by her supervisors and that her health was being impacted, and requested that Gratto take action to "stop the harassment." (*Id.* ¶ 81.) On March 18, 2016, Plaintiff submitted a response to the counseling memorandum, and complained that she was being penalized as a result of becoming sick. (*Id.* ¶ 83.)

On March 23, 2016, Plaintiff was again required to take a sick day for gastrointestinal testing. (*Id.* ¶ 84.) On March 28, 2016, Plaintiff submitted a complaint for "workplace bullying"

under New York State's Dignity for All Students Act ("DASA") using a "Dignity for All: Employee Reporting Form." (*Id.* ¶ 85.) While such complaints must be investigated immediately, Plaintiff's complaints were not investigated in a timely fashion. (*Id.* ¶ 86.)

Plaintiff provided her supervisors with advance notice of an April 11, 2016 endoscopy; nevertheless, Plaintiff was "written up" for her absence. (*Id.* 87.) On April 12, 2016, Plaintiff again emailed Gratto to report that the effect of the stress and to inform him that she was going home. (*Id.* ¶ 88.) Shortly thereafter, Plaintiff was contacted by Knight, who confirmed that Gratto had sent him the information concerning Plaintiff's complaints. (*Id.*) However, the next day, Plaintiff was issued a second counseling memorandum by Schuchman, alleging that Plaintiff was insubordinate and had left work even though she was not sick. (*Id.* ¶ 89.) Plaintiff was also informed, via email from Schuchman, that Schuchman and Amelio would physically monitor Plaintiff's sessions every day during the coming week. (*Id.* ¶ 91.) Plaintiff then again contacted Gratto and Knight seeking information about the status of her complaints. (*Id.* ¶ 92.)

On April 14, 2016, Plaintiff was assigned an additional high school student outside of her scope of licensed practice. (*Id.* ¶ 90.) On April 19, 2016, Plaintiff again took a sick day, due to medical complications, including her gastrointestinal disorders, from the ongoing stress. (*Id.* ¶ 93.) That day, Schuchman emailed Plaintiff, stating "I see you are out again today. I will plan on being there both Thursday and Wednesday to make up [the observations]." (*Id.* ¶ 94.) The following Wednesday, April 20, 2016, Plaintiff continued her sick leave, due to the same gastrointestinal issues. (*Id.* ¶ 96.) That day, Schuchman again emailed Plaintiff, stating "I see you are out again today. Please plan on [Amelio] and I being there Thursday and Friday." (*Id.* ¶ 97.) On April 21, 2016, Plaintiff continued her sick leave, and again contacted Coles and Knight to complain about ongoing "bullying" by Schuchman and Amelio. (*Id.* ¶¶ 99–100.)

On April 26, 2016, Plaintiff provided BOCES with a doctor's note, and requested medical leave for three to four weeks because of aggravated physical manifestations of "severe workplace stress," including "abdominal pain and the appearance of esophageal ulcers and gastritis." (*Id.* ¶¶ 101–02.) Two days later, Plaintiff received a registered letter from Knight acknowledging receipt of her DASA complaint and directing her to come to his office on the day of her return to work to meet with BOCES' legal counsel and discuss her allegations. (*Id.* ¶ 103.) Although Plaintiff initially requested medical leave of three or four weeks, Plaintiff extended her leave by over two additional weeks, due to medical complications. (*Id.* ¶¶ 104–05.)

Following Plaintiff's return on June 13, 2016, Schuchman adopted a practice of regularly observing Plaintiff's sessions, including during Plaintiff's entire first week back at work. (*Id.* ¶¶ 106, 109.) That same day, Plaintiff again emailed Knight, Gratto and and Coles, reporting "the continuation of Schuchman's bullying," and explaining that she believed it was "in her best interest to have legal representation for the mandatory meeting with Knight and the BOCES legal counsel." (*Id.* ¶ 107.) However, "BOCES refused [Plaintiff] the ability to bring legal representation to the meeting." (*Id.* ¶ 108.)

On June 15, 2016, Schuchman and Amelio again appeared to observe Plaintiff's lessons, but Plaintiff was already in the process of taking an additional medical leave due to worsening symptoms. (*Id.* ¶ 110.) Two days later, Plaintiff again contacted Knight, Gratto and Coles, complaining about the lack of action taken since her March 7, 2016 complaint. (*Id.* ¶ 112.)

On June 22, 2016, at a meeting with Knight and BOCES Human Resources personnel, Plaintiff provided a letter of resignation, explaining that she was doing so due to constant harassment and retaliation. (*Id.* ¶ 113.) Two days later, on the last day of the academic year,

Schuchman and Walker issued Plaintiff a third (incorrectly dated) counseling memorandum. (*Id.* ¶¶ 114–15.) Plaintiff's retirement became effective on June 30, 2016. (*Id.* ¶ 117.)

On March 3, 2017, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging that Defendants had engaged in unlawful discriminatory practices. (*Id.* ¶ 118.) During the course of the NYSDHR investigation, BOCES agreed to award Plaintiff additional backpay based on work performed during the 2015–2016 academic year, but credited the pay as corresponding to the 2016–2017 academic year. (*Id.* ¶¶ 119, 121.) Plaintiff believes the accounting decision was intended to cause Plaintiff economic injury. (*Id.*)

On August 31, 2017, the NYSDHR issued a determination indicating that probable cause existed that Defendants engaged in unlawful discriminatory practices toward Plaintiff. (*Id.* ¶ 120.) On June 20, 2018, Plaintiff received a Dismissal and Notice of Rights from the EEOC. (*Id.* ¶ 122.) Plaintiff now alleges that Defendants failed to enforce BOCES's own policies, discriminated against her, subjected her to a hostile work environment, retaliated against her, and forced her from her tenured position with BOCES. (*Id.* ¶¶ 124–27.) Plaintiff seeks damages, including for lost wages, pain and suffering, and costs, as well as a judgment declaring Defendants' actions unlawful. (*Id.* ¶¶ 132–42.)

B.  Procedural Background

Plaintiff initiated this Action by filing a Complaint on September 18, 2018; however, there was a filing error with the original document, and the Complaint was refiled correctly two days later. (*See* Dkt. No. 1; Compl. (Dkt. No. 4).) On January 2, 2019, Plaintiff filed her First Amended Complaint. (*See* Dkt. No. 23.) On March 13, 2019, Plaintiff filed the operative SAC. (*See* SAC.) On June 28, 2019, Defendants filed their Motion and accompanying papers. (*See* Not. of Mot (Dkt. No. 36); Defs.' Mem. in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 38); Decl.

of Karen Rudnicki, Esq. in Supp. of Mot. ("Rudnicki Decl.") (Dkt. Nos. 37).) On August 23, 2019, Plaintiff filed her Response. (*See* Pl.'s Mem. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 42).) On September 6, 2019, Defendants filed their Reply. (*See* Defs.' Reply Mem. in Supp. of Mot. ("Defs.' Reply") (Dkt. No. 43).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Further, generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

B. Analysis

While the SAC does not clearly identify individual causes of action, Defendants raise arguments to address several causes of action that might be fairly discernible from the face of the SAC. In particular, Defendants argue that most claims are barred by the applicable statutes of limitations; that Plaintiff identified no disparate treatment based on membership in a constitutionally protected class, or even a class protected under Title VII; that "class of one" equal protection claims are impermissible in the context of public employment; that personnel decisions short of termination do not constitute a deprivation of a property interest under the

Fourteenth Amendment; that Plaintiff has not alleged any conduct severe enough to violate substantive due process; that Plaintiff has failed to identify a policy or policy-maker that directly violated her constitutional rights; that Plaintiff failed to identify the personal involvement of any Individual Defendant in constitutional violations; that all Individual Defendants are protected by qualified immunity; that Plaintiff has failed to adequately plead that she suffers from a disability within the meaning of the ADA; that Plaintiff does not allege that BOCES was motivated by discriminatory intent toward her disability; and that Plaintiff's claims of retaliation for taking medical leave must be pursued under separate statutes and lack the requisite nexus to Plaintiff's claimed disability. (*See generally* Defs.' Mem.) The Court addresses these arguments only to the extent necessary.

<u>1. Equal Protection Claims</u>

To state a claim under the Equal Protection Clause, a plaintiff "may either allege discrimination based on membership in a protected class, or allege a 'class of one' claim." *Weslowski v. Zugibe*, 14 F. Supp. 3d 295, 317 (S.D.N.Y. 2014) (citation, alteration and quotation marks omitted). The Supreme Court, however, has held that "the class-of-one theory of equal protection has no application in the public employment context." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 607 (2008); *see also id.* at 609 ("Public employees typically have a variety of protections from [certain] personnel actions . . . , but the Equal Protection Clause is not one of them."); *Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135, 140 (2d Cir. 2010) ("The Supreme Court's decision in [*Engquist*] eliminated class-of-one claims for government employees."). Accordingly, insofar as Plaintiff alleges a deprivation of equal protection based on such a theory, she fails to state a claim.

At the same time, "the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently." *Engquist*, 553 U.S. at 605. To state a claim for discriminatory treatment in public employment under a protected-class theory, a plaintiff must allege that: "(1) she is a member of a protected class; (2) her job performance was satisfactory; (3) she suffered adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination." *Rogers v. Roosevelt Union Free Sch. Dist.*, No. 09-CV-3862, 2012 WL 6163130, at *9 (E.D.N.Y. Dec. 7, 2012), *aff'd*, 553 F. App'x 88 (2d Cir. 2014). Such adverse employment actions may include the creation of a "hostile work environment," that is a workplace "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (ultimately quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Importantly, the alleged discrimination must be *intentional* discrimination, i.e., "that the decisionmaker selected or reaffirmed a particular course of action . . . because of, not merely in spite of, its adverse effects upon an identifiable group." *Davis v. N.Y. State Office of Mental Health*, No. 05-CV-5599, 2009 WL 5178440, at *13 (E.D.N.Y. Dec. 31, 2009) (quoting *Personnel Admr v. Feeney,* 442 U.S. 256, 279 (1979)) (alteration and quotation marks omitted). Additionally, "a plaintiff pursuing a claim for employment discrimination under § 1983 . . . must establish that the defendant's discriminatory intent was a 'but-for' cause of the adverse employment action or the hostile environment." *Naumovski v. Norris*, 934 F.3d 200, 214 (2d Cir. 2019). While district courts within the Second Circuit have generally assumed that Section 1983 claims can be brought for disability discrimination, *see Rogers*, 2012 WL 6163130, at *9

(considering a disability discrimination claim brought pursuant to Section 1983); *Davis*, 2009 WL 5178440, at *13–14 (same); *but see Lener v. Hempstead Pub. Sch.*, 55 F. Supp. 3d 267, 281 (E.D.N.Y. 2014) ("Disability and/or perceived disability are not suspect or quasi-suspect classifications." (citation omitted)), they have recognized that the Equal Protection clause only proscribes disability discrimination where "there is no rational relationship between the disparity of treatment and some legitimate governmental purpose," *Davis*, 2009 WL 5178440, at *13 (quoting *Garcia v. State Univ. Of N.Y. Health Scis. Ctr.*, 280 F.3d 98, 109 (2d Cir. 2001)); *see also Garcia*, 280 F.3d at 111 (explaining that Fourteenth Amendment bars "[g]overnment actions based on discriminatory animus or ill will towards the disabled").

Here, Plaintiff fails to allege circumstances raising an inference of the requisite discriminatory intent. To be sure, Plaintiff's allegations suggest inferences that Defendants bore her ill-will because of her resistance to BOCES's billing practices, (SAC ¶¶ 25–26 (alleging retaliation for complaints about the use of her name for Medicaid-related certifications)), or because of her complaints about other employees and her workload, (*id.* ¶¶ 66–68, 76–78 (alleging that she was given an increased workload after complaining about her workload and Amelio's conduct)). However, none of Plaintiff's allegations suggests "discriminatory animus or ill will towards the disabled." *Garcia*, 280 F.3d at 111. For example, Plaintiff points to no similarly situated individuals who were treated better. *See Mandel v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (citation and quotation marks omitted)). Nor does she allege any comments disparaging the disabled. *See Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 252 (S.D.N.Y. 2015) (analyzing potentially discriminatory remarks to determine whether they were "probative

of discriminatory intent to satisfy the casual requirement of a prima facie case of discrimination"); *Baker v. CSX Transp., Inc.*, 546 F. Supp. 2d 90, 101 (W.D.N.Y. 2008) (dismissing an ADA claim for failure to demonstrate discriminatory intent in part based on the lack of "any disparaging or discriminatory remarks with respect to persons suffering from a disability").

To the extent that Plaintiff relies on statements disparaging her for taking medical leave, (SAC ¶ 41), such statements do not reflect the specific animus necessary for a disability claim under the Fourteenth Amendment, *see Garcia*, 280 F.3d at 111 (requiring "discriminatory animus or ill will towards the disabled").[3] Under certain *statutory* provisions, frustration with an employee's legally protected absences may be deemed discriminatory, and thus disparate treatment based on such frustration would be illegal under those statutes. *See Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (analyzing an employee's claim, under the Family and Medical Leave Act, that he experienced retaliation after taking a legally protected medical leave). However, it is not "irrational" for an employer to object to an employee's absences and to resist such accommodations to disability. *See Negron v. City of New York*, No. 10-CV-2757, 2011 WL 4737068, at *16 (E.D.N.Y. Sept. 14, 2011) (rejecting a § 1983 claim of disability discrimination based on denial of additional medical leave "because the Equal Protection Clause does not require accommodations for the disabled" (citation omitted)), *report and recommendation adopted*, 2011 WL 4729754 (E.D.N.Y. Oct. 6, 2011); *see also Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368 (2001) ("If special accommodations for the disabled are to be required, they have to come from positive law and not through the Equal Protection

_____

[3] Several additional reasons why these comments cannot form the basis of Defendants claims (including the applicable statute of limitations and a failure to attribute these comments to Defendants) are discussed below.

Clause." (footnote omitted)).  In other words, "[f]ailure to provide a reasonable accommodation cannot form the basis of an Equal Protection claim."  *O'Leary v. Town of Huntington*, No. 11-CV-3754, 2012 WL 3842567, at *14 (E.D.N.Y. Sept. 5, 2012) (citations omitted).  Indeed, the Supreme Court has gone even further, holding that a federal statute guaranteeing such accommodations by state institutions was not even a valid exercise of congressional power under the Fourteenth Amendment.  *See Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 33–37 (2012) (holding that Congress lacked the authority to abrogate state sovereign immunity when it legislated certain provisions of the FMLA).  Accordingly, Plaintiff has proffered no allegations of the requisite discriminatory intent, and all Equal Protections claims are dismissed.

### 2.  Due Process Claims[4]

"In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest."  *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (citation omitted).

"Although the right to continued employment is a property right protected under the due process clause, personnel decisions *short of termination* do not constitute a deprivation of a property interest cognizable under the Fourteenth Amendment."  *Mirabilio v. Reg'l Sch. Dist. 16*,

---

[4] While Defendants briefly address potential "substantive due process" claims, (Defs.' Mem. 8–9), Plaintiff does not pursue any such claim.  (*see generally* Pl.'s Mem.).  The Court therefore considers all such claims to be waived.  Moreover, insofar as the SAC suggests such a claim, the Court rejects it.  "For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (citation and quotation marks omitted).  Nothing alleged in the SAC even comes close to meeting this high standard.  *See Goldfarb v. Town of W. Hartford*, 474 F. Supp. 2d 356, 371–72 (D. Conn. 2007) (explaining that workplace harassment and bullying generally does not amount to a violation of substantive due process).

761 F.3d 212, 213–14 (2d Cir. 2014) (emphasis in original) (citations, alteration, and quotation

marks omitted); *see also Epstein v. County of Suffolk*, No. 14-CV-0937, 2015 WL 5038344, at

*11 (E.D.N.Y. Aug. 26, 2015) (same). Accordingly, insofar as Plaintiff asserts a protected

property interest in a particular schedule, specific work assignments, or a certain working

environment, she fails to state a claim.[5]

To the extent Plaintiff alleges that she was effectively terminated, her claim is slightly

more complex. While Plaintiff acknowledges that, as a formal matter, she "provided a letter of

resignation," the SAC can be fairly read to assert that Plaintiff was nevertheless effectively

terminated, i.e., "constructively discharged." (*See* SAC ¶ 113 ("Plaintiff provided a letter of

resignation, explaining that she was doing so due to constant harassment and retaliation."); Pl.'s

Mem. 22 (discussing "Plaintiff's constructive discharge claim").)

In principle, constructive discharge theories are available to public employees alleging

violations of their due process rights. *See Goldfarb v. Town of W. Hartford*, 474 F. Supp. 2d

356, 373–74 (D. Conn. 2007) ("Courts have typically addressed actual, not constructive,

deprivations of protected interests. Nevertheless, courts have recognized that Fourteenth

Amendment deprivations can be constructive as well as actual." (citation and quotation marks

omitted)); *see also Hoover v. Cnty. of Broome*, 340 F. App'x. 708, 711 (2d Cir. 2009) (analyzing

---

[5] Second Circuit precedent predating *Mirabilio* appears to recognize a slightly wider class of employment-related protected property interests. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 318 (2d Cir. 2002) (concluding that the Fourteenth Amendment protects a property interest in a particular position or rank). This Court need not undertake to fully harmonize these precedents. For the purposes of resolving the instant Motion, it is sufficient that *Mirabilio* is both later in time and more directly applicable. Moreover, even the line of cases from which *Ciambriello* derives acknowledges that "a particular work assignment or employment benefit" are "interests that are not entitled to the protections afforded by the Due Process Clause." *Ezekwo v. N. Y. C. Health & Hosps. Corp.*, 940 F.2d 775, 783 (2d Cir. 1991).

a due process claim based on a constructive discharge); *Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 371–72 (E.D.N.Y. 2014) (same). However, the "standard for constructive discharge is even higher than that required to prevail on a hostile environment claim." *Mandel v. Champion Int'l Corp.*, 361 F. Supp. 2d 320, 327 (S.D.N.Y. 2005); *see also Miller v. Praxair, Inc.*, 408 F. App'x. 408, 410 (2d Cir. 2010) (explaining that the standard for constructive discharge claims is "demanding"). In particular, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily. . . . [W]orking conditions are intolerable when, viewed as a whole, they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003) (citations and quotation marks omitted).

Even assuming, however, that Plaintiff's allegations adequately support a claim of "constructive discharge," Plaintiff's due process claim fails because she has not pleaded any deficiencies in the process she was afforded. "[I]n evaluating what process satisfies the Due Process Clause, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera-Powell v. N. Y. C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (citation and quotation marks omitted). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Id.* (citations omitted). For the purposes of this inquiry, constructive discharges are generally considered precisely such "random and unauthorized" actions for which the State need only provide an adequate post-deprivation remedy. *See Fotopolous*, 11 F. Supp. 3d at 371 ("While a public employee with a property right in his job is normally entitled to a

pretermination hearing, it is impractical for employees who are constructively discharged to obtain a pre-termination hearing, and the availability of [a] . . . proceeding subsequent to termination provides adequate procedural due process." (citations omitted)); *see also Hoover*, 340 F. App'x at 711 (explaining that the plaintiff "would not be entitled to a pre-deprivation remedy for the constructive discharge").

Here, Plaintiff alleges no defect in the post-deprivation state remedies available to her after her purported constructive discharge. Nor likely could she; courts have generally held that New York State's Article 78 proceedings provide sufficient procedural protections to constructively discharged public employees. *See Fotopolous*, 11 F. Supp. 3d at 371 (explaining that when a public employee is constructively discharged, "the availability of an Article 78 proceeding subsequent to termination provides adequate procedural due process" (collecting cases)); *McGann v. City of New York*, No. 12-CV-5746, 2013 WL 1234928, at *8 (S.D.N.Y. Mar. 27, 2013) (assuming that a plaintiff was constructively discharged, but concluding that he was not denied due process because his "post-deprivation Article 78 rights were meaningful" and he "failed to avail himself of them" (citations omitted)). Plaintiff does not allege that she attempted to take advantage of such post-deprivation rights, nor that they were otherwise unavailable. Accordingly, Plaintiff's due process claims are dismissed.

### 3. Title VII

"Title VII prohibits an employer from taking an adverse employment action against an individual 'because of such individual's race, color, religion, sex, or national origin.'" *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (some quotation marks omitted) (ultimately quoting 42 U.S.C. § 2000e–2(a)(1)). Here, the SAC is devoid of any factual allegations suggesting discrimination based on Plaintiff's race, color, religion, sex, or national origin.

Indeed, Plaintiff's race, color, religion and national origin are unstated in the SAC and unknown, and while Plaintiff is presumably a woman, the SAC gives no hint of any factual connection between Plaintiff's gender and the alleged adverse treatment.

Plaintiff's sole argument in support of her Title VII claims is a bald assertion that "the anti-retaliation provision of Title VII has a broad reach," and that Plaintiff "engaged in conduct by first informally and then formally objecting to her treatment at the hands of her employers." (Pl.'s Mem. 19 (alteration omitted) (quoting *Birkholz v. City of New York*, No. 10-CV-4719, 2012 WL 580522 (E.D.N.Y. Feb. 22, 2012).) This argument evinces a misunderstanding of the scope and nature of Title VII's retaliation provision. Title VII's retaliation provision provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 89–90 (2d Cir. 2015) (alteration and quotation marks omitted) (quoting 42 U.S.C. § 2000e–3(a)). In other words, Title VII does not bar retaliation against employees based on their opposition to all unwelcome, hostile or even illegal employment practices. Rather, Title VII bars retaliation against employees for opposing employment practices made illegal by Title VII itself. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("An employee's complaint may qualify as protected activity, satisfying the first element of this test, 'so long as the employee has . . . a good faith, reasonable belief that [she] was opposing an employment practice made unlawful by Title VII.'" (one alteration in original) (citations and quotation marks omitted)). As Plaintiff

does not allege that she ever opposed discriminatory treatment based on "race, color, religion, sex, or national origin," her Title VII retaliation claim is without merit.

### 4. ADA Claims[6]

#### a. Appropriate ADA Defendants

As a threshold matter, Title I of the ADA prohibits discrimination only by employers, not individual actors. It provides, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment," and defines "covered entity" as "employer, employment agency, labor organization, or joint labor-management committee." 42 U.S.C. §§ 12111–12. Accordingly, courts have uniformly held that "individual defendants are not subject to personal liability" under this provision. *Emmons v. City Univ. of N. Y.*, 715 F. Supp. 2d 394, 407 (E.D.N.Y. 2010) (collecting cases), *order modified*, (July 2, 2010); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) (explaining that even where the ADA's statutory text appears to prohibit individual retaliation, the ADA does not provide for individual liability). The Court therefore dismisses all claims against Individual Defendants in their individual capacities. Moreover, because "suits against officers in their official capacity are directed at the office itself," *Williams v. Annucci*, 895 F.3d 180, 187 (2d Cir. 2018) (citation, alteration, and quotation marks omitted); *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent" (citation and quotation marks omitted)), all claims against Individual Defendants in their

---

[6] Although Title II of the ADA prohibits public entities from discrimination with respect to services, programs, or activities, the Second Circuit has determined that the ADA "unambiguously limits employment discrimination claims to Title I." *Mary Jo C. v. N. Y. State & Local Ret. Sys.*, 707 F.3d 144, 171 (2d Cir. 2013). Accordingly, the Court construes Plaintiff's ADA claims as arising under Title I.

"official capacities" are duplicative of claims against BOCES.  Accordingly, the Court dismisses

all claims against Individual Defendants in their official capacities as well.  *See Emmons*, 715 F.

Supp. 2d at 408 (dismissing all official capacity claims against individual defendants "because

they are wholly redundant to plaintiff's claims against [the employer] itself" (citation omitted)).

### b.  Statute of Limitations

"A plaintiff seeking to assert an ADA discrimination claim must first file an

administrative charge with the EEOC or an equivalent agency within three hundred days after the

alleged unlawful employment practice.  Failure to do so renders the claim time-barred."

*Jones v. City of New York*, No. 17-CV-4894, 2020 WL 91532, at *4 (S.D.N.Y. Jan. 8, 2020)

(citations and quotation marks omitted).  Here, Plaintiff alleges that she filed a complaint with

the NYSDHR on March 3, 2017.  (SAC ¶ 118.)  Indeed, Plaintiff acknowledges that "the

applicable statutory period" is "300 days prior to the filing of Plaintiff's NYSDHR charge."

(Defs.' Mem. 13.)  Accordingly, in addressing Plaintiff's ADA claims, the Court considers only

those adverse employment actions occurring within the statutory limitations period, i.e., on or

after May 7, 2016.

### c.  Discrimination

### i.  Standard of Review

Discrimination claims under the ADA are generally analyzed under the burden-shifting

analysis established by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411

U.S. 792 (1973).  *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013).[7]  Under

---

[7] To be clear, where a plaintiff offers "direct evidence of discrimination," she need not
proceed under *McDonnell Douglas.  See Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d
Cir. 2015).  However, because direct evidence of discrimination is often absent, *McDonnell
Douglas* offers an alternative, usually more advantageous, path for plaintiffs to establish
discriminatory intent.  *See id.; see also E.E.O.C. v. Port Auth. of N. Y. & N. J.*, 768 F.3d 247, 254

this test, initially a plaintiff need only establish a prima facie case of disability discrimination. *Id.* To do so, a plaintiff must demonstrate that: "(1) [her] employer is subject to the ADA; (2) [she] was disabled within the meaning of the ADA; (3) [she] was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) [she] suffered adverse employment action because of [her] disability." *Id.* (citation omitted). If an employee establishes a prima facie case of discrimination, the burden shifts to the defendant-employer, who may rebut his claim with legitimate, non-discriminatory reasons for the adverse employment action. *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015) (collecting cases), *aff'd sub nom. Sattar v. United States Dep't of Homeland Sec.*, 669 F. App'x 1 (2d Cir. 2016). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981) (citation and footnote omitted). If the defendant presents legitimate reasons for the employment action, the burden shifts back to the plaintiff to establish that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Sattar*, 129 F. Supp. 3d at 137 (quotation marks omitted) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)). Ultimately, Plaintiff must establish not only the presence of discriminatory motive, but that this motive was a "but-for" cause of the adverse action. *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019), *petition for cert. docketed*, No. 19-732 (Dec. 10, 2019).

---

(2d Cir. 2014) ("[W]hile a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, it must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible . . . ." (citations, quotation marks, and alterations omitted)).

The above framework, although largely developed in the context of the summary judgment stage, applies with equal force to motions to dismiss. "To the same extent that the *McDonnell Douglas* temporary presumption reduces the facts a plaintiff would need to *show* to defeat a motion for summary judgment prior to the defendant's furnishing of a non-discriminatory motivation, that presumption also reduces the facts needed to be *pleaded* under *Iqbal.*" *Littlejohn v. City of New York*, 795 F.3d 297, 310 (2d Cir. 2015) (emphases in original). Accordingly, Plaintiff may rely on a reduced "pleading burden, so that the alleged facts need support only a minimal inference of bias." *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016); *see also Dooley v. JetBlue Airways Corp.*, 636 F. App'x 16, 21 (2d Cir. 2015) (applying *Littlejohn*'s "minimal inference of discriminatory motivation" standard to ADA claims (citation and quotation marks omitted)).

### ii. Disability

Plaintiff has sufficiently alleged that BOCES is an "employer" subject to the ADA. (*See* SAC ¶ 8.) Similarly, Plaintiff has sufficiently alleged that she was qualified for her position, having been employed by BOCES for 28 years, and received favorable performance evaluations and numerous professional licenses. (*Id.* ¶¶ 11, 18–19.) Defendants do not dispute either of these elements of Plaintiff's prima facie case. *See McMillan*, 711 F.3d at 125 (providing the test for a prima facie case of ADA discrimination). However, Plaintiff's disability status is, at this stage, a closer question. Under the statutory scheme and related case law, a qualifying disability "must limit a major life activity and the limitation must be substantial." *Pugliese v. Verizon N.Y., Inc.*, No. 05-CV-4005, 2008 WL 2882092, at *10 (S.D.N.Y. July 9, 2008) (citation omitted). "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and

the existence of any actual or expected permanent or long term impact." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)). However, "regulations make clear that the 'inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998) (quoting 29 C.F.R. § 1630.2(j)(3)(1)), *cert. denied*, 526 U.S. 1018 (1999). Here, Plaintiff's disability claim is grounded in a panoply of medical conditions, including irritable bowel syndrome, hiatal hernia, gastritis, gastroesophageal reflux disease, ulcers, mitral valve prolapse, and reactive asthma. (SAC ¶¶ 13–15.) Plaintiff has further alleged that these conditions cause her severe pain and interfere with her work and sleep, (*id.*), and that these conditions have continued to affect her in retirement, (*id.* ¶ 65). Moreover, Plaintiff has alleged that she was repeatedly forced to take medical leave as a result of these conditions, (*id.* ¶¶ 62, 71, 75, 84, 93), culminating in a medical leave, taken at the direction of her doctor, that lasted nearly six weeks, (*id.* ¶¶ 102–105). Accordingly, Plaintiff's allegations suggest that that her conditions are severe, extended in duration, and have substantially impacted her ability to work. *See Capobianco*, 422 F.3d at 57 (providing factors to be considered when determining if an individual qualifies as "disabled" under the ADA).

Defendants' arguments to the contrary are unavailing. Defendants point to several decisions that demonstrate that "courts do not consider gastrointestinal issues de facto disabilities absent a showing of such substantial limitation." (Defs.' Mem. 17.) This Court does not disagree, and its decision here does not hold otherwise. Plaintiff has plausibly alleged a disability not simply by asserting generic "gastrointestinal issues." Rather she has asserted gastrointestinal issues *and* specifically alleged several ways in which those issues have impacted, and continue to impact her sleep, ability to work, and general ability to function. *See*

*Capobianco*, 422 F.3d at 56 (explaining that "major life activities" inclue "activities that are of central importance to daily life" (citation and quotation marks omitted)); *see also Epstein*, 2016 WL 4257349, at *3 (recognizing that that "sleep is undoubtedly a major life activity" (citation and quotation marks omitted)); *Primmer v. CBS Studios, Inc.*, 667 F. Supp. 2d 248, 258 (S.D.N.Y. 2009) (explaining that a plaintiff who is "precluded from a broad class of jobs" by her medical conditions is likely disabled).

Moreover, the cases Defendants rely on are distinguishable. Some are decisions reached after the production of evidence, such that the court was able to determine that the plaintiffs in those cases had failed to adduce sufficient evidence to show that their particular conditions amounted to a disability under the ADA. *See Johnson v. N. Y. Med. Coll.*, No. 95-CV-8413, 1997 WL 580708, at *6 (S.D.N.Y. Sept. 18, 1997) (granting summary judgment because "plaintiff has failed to make a prima facie showing that she is disabled by her colitis within the meaning of the ADA" (italics omitted)); *Caporilli v. City of Rome, N.Y.*, No. 85-CV-1320, 1992 WL 209327, at *4 (N.D.N.Y. Aug. 13, 1992) (explaining, after trial and based on the plaintiff's own testimony, that plaintiff's ileostomy did not substantially limit his major life activities). Other cases, such as *Sacay v. Research Foundation of City University of New York*, 44 F. Supp. 2d 496, 500 (E.D.N.Y. 1999), applied an outdated, heightened pleading standard that has since been overruled. *See Sanzo v. Uniondale Union Free Sch. Dist.*, 225 F. Supp. 2d 266, 269 (E.D.N.Y. 2002) (recognizing that *Sacay* was overruled by *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)); *see also Littlejohn*, 795 F.3d at 311 (discussing the continued force of *Swierkiewicz*); *Port Auth. of N. Y. & N.J.*, 768 F.3d at 254 (same). Finally, *Nowak v. EGW Home Care, Inc.*, 82 F. Supp. 2d 101 (W.D.N.Y. 2000) is unavailing because it does not discuss gastrointestinal issues at all. *See* 82 F. Supp. 2d at 110–11. Rather, the court simply concluded

that a bare allegation of being "placed on disability leave by [a] doctor" was insufficient to state a claim under the Human Rights Law. *Id.* at 112 (quotation marks omitted). Accordingly, the Court concludes that Plaintiff has plausibly alleged that she suffered from a disability under the ADA.

### iii. Discrete Adverse Employment Actions

However, while Plaintiff may have adequately alleged disability, she has failed to adequately allege that she suffered actionable adverse employment actions. First, as explained above, the applicable statute of limitations bars the Court from considering discrete adverse employment actions that occurred before May 7, 2016. After that date, Plaintiff alleges only that (1) Schuchman adopted an unusual practice of regularly observing her classes, (SAC ¶¶ 106–10), (2) BOCES "refused [Plaintiff] the ability to bring legal representation" to a planned meeting, (*id.* ¶ 108), (3) Plaintiff received an improper (backdated) counseling memorandum on June 24, 2016, (*id.* ¶¶ 114–15), and (4) BOCES applied Plaintiff's backpay to 2016–2017 rather than the previous year. None of these adequately states an "adverse employment action," let alone one suggesting discriminatory intent. First, discrimination claims based solely on excessive scrutiny are precluded by clear caselaw. *See Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y. Sept. 30, 2016) ("[E]xcessive scrutiny, criticism, and negative evaluations of an employee's work are not materially adverse employment actions unless such conduct is accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss." (citation and quotation marks omitted)); *Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 226 (E.D.N.Y. 2016) (explaining that "close monitoring by a supervisor or excessive scrutiny" does not "constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation" (citations and

quotation marks omitted)); *Hall v. N. Y. C. Dep't of Transp.*, 701 F. Supp. 2d 318, 336 (E.D.N.Y. 2010) (explaining that "reprimands and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation" (citation, alteration, and quotation marks omitted)). The same holds true for claims based on the delivery of counseling memoranda. *See St. Juste v. Metro Plus Health Plan*, 8 F. Supp. 3d 287, 307–08 (E.D.N.Y. 2014) (explaining that "a counseling memorandum, standing alone, does not constitute an adverse employment action" (collecting cases)); *Morales v. NYS Dep't of Labor*, 865 F. Supp. 2d 220, 244 (N.D.N.Y. 2012) (explaining that the "issuance of a counseling memorandum and a notice of discipline . . . is not an adverse employment action as a matter of law" (citations and quotation marks omitted)), *aff'd,* 530 F. App'x. 13 (2d Cir. 2013). Next, while Plaintiff's allegation concerning the denial of legal representation is somewhat ambiguous, the allegation has nothing to do with a "materially adverse change in the terms and conditions of employment;" accordingly, it cannot qualify as an "adverse employment action." *Mathirampuzha v. Potter*, 548 F.3d 70, 78–79 (2d Cir. 2008) (citation, italics, and quotation marks omitted).[8] Finally, Plaintiff's claim concerning the date of her backpay lacks the clarity necessary to survive under Rule 8. Plaintiff alleges ("upon information and belief") that BOCES awarded her "retro pay . . . based on the 2015/16 School Year; however, BOCES chose to credit the retro pay to the 2016/17 School Year." (SAC ¶ 119.) Plaintiff further alleges that "this was intended to further subject [her] to economic injury, as she would be among the only retirees who would be impacted by the 2016/17 School Year credit, as she had retired." (*Id.* ¶ 119.) The

---

[8] It is unclear whether Plaintiff alleges that BOCES objected to her bringing a legal representative, or whether BOCES simply refused to provide her with legal representation. (*See* SAC ¶ 108 (alleging that BOCES "refused [Plaintiff] the ability to bring legal representation" to a planned meeting).)

Court is unable to determine what precisely BOCES is alleged to have done, and how this action

is supposed to have harmed Plaintiff. Plaintiff does not, for example, claim that BOCES paid her

less by crediting the "retro pay" to a later year. Accordingly, the allegation fails to "give the

defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550

U.S. at 555 (citation, alteration, and quotation marks omitted).

### iv. Non-discrete Actions

To the extent that Plaintiff seeks to avoid the statute of limitations by basing her claims

on theories of "hostile work environment" or "constructive discharge," such claims fail because

the allegations do not suggest the requisite discriminatory intent.[9]

The Second Circuit has recognized that hostile environment claims are cognizable under

the ADA. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019) ("[D]isabled

Americans should be able to assert hostile work environment claims under the ADA . . . ."

(citation omitted)). In evaluating such claims, courts apply the same general standards as those

applicable to Title VII. *See id.* (citing Title VII cases); *see also Giambattista v. Am. Airlines,

Inc.*, 5 F. Supp. 3d 284, 294 (E.D.N.Y. 2014) (applying Title VII standards for an ADA hostile

work environment claim), *aff'd*, 584 F. App'x 23 (2d Cir. 2014).[10] Thus, to plead a prima facie

hostile work environment claim, a plaintiff must show "(1) that the harassment was sufficiently

severe or pervasive to alter the conditions of [her] employment and create an abusive working

---

[9] "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for the purposes of determining liability." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (footnote omitted). Similarly, "the limitations period for [a plaintiff's] constructive-discharge claim runs from the date he gave notice of his resignation." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016).

[10] As noted above, however, the Second Circuit has recently identified a crucial distinction between Title VII and ADA claims. Only the latter require that discriminatory intent be the "but-for" cause of the discriminatory conduct. *See Natofsky*, 921 F.3d at 349.

environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." *Fox*, 918 F.3d at 74 (citation, alteration, and quotation marks omitted). This standard has both objective and subjective components: the conduct complained of must be "severe or pervasive enough" that a reasonable person would find it hostile or abusive, and the victim must also subjectively perceive the work environment as abusive. *Id.* (citation and quotation marks omitted). Of course, a plaintiff must also plead facts that show that the conduct created such an environment because of the plaintiff's disability. *Dechberry v. N. Y. C. Fire Dep't*, 124 F. Supp. 3d 131, 156 (E.D.N.Y. 2015) (explaining that an ADA plaintiff must allege that the defendants' conduct created a hostile environment "because of the plaintiff's . . . disability" (citations, footnote, and quotation marks omitted)). As already noted, the "standard for constructive discharge is even higher than that required to prevail on a hostile environment claim . . . ." *Mandel*, 361 F. Supp. 2d at 327; *see also Green v. Brennan*, 136 S. Ct. 1769, 1779 (2016) (noting that "a hostile-work-environment claim is a lesser included component of the *graver* claim of hostile-environment constructive discharge" (emphasis in original) (citation and quotation marks omitted)).

Here, the Court need not decide whether Defendants' conduct rises to such a level because, in any event, Plaintiff's allegations do not suggest that Defendants created a hostile work environment *because* of Plaintiff's purported disability. *See De Figueroa v. New York*, 403 F. Supp. 3d 133, 161 (S.D.N.Y. 2019) ("Because [the p]laintiff has failed to allege facts that give rise to an inference that [the d]efendants' allegedly hostile conduct was motivated by her disability, her hostile work environment claims under the ADA . . . fail."); *Lewis v. Blackman Plumbing Supply LLC*, 51 F. Supp. 3d 289, 309 (S.D.N.Y. 2014) ("To substantiate a hostile-work environment claim, a plaintiff must allege facts that would tend to show that the complained of

conduct . . . creates such an environment *because of the plaintiff's disability*." (emphasis added) (citation, alteration, and quotation marks omitted)); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 585 (S.D.N.Y. 2008) (noting that the plaintiff's claim should be dismissed because there was "no evidence that the [work] environment . . . was permeated with frequent, severe and offensive *disability-related* comments" (emphasis added)); *see also Natofsky*, 921 F.3d at 349 (requiring "but-for" causation for ADA claims).[11] On the contrary, Plaintiff's SAC makes clear that that the overriding cause for any alleged abuse was her opposition to BOCES's recordkeeping practices and her expanding workload. (*See* SAC ¶¶ 20–35, 45–49, 51–53, 66–70.) Indeed, the documents attached to Plaintiff's SAC, including her administrative complaint,

---

[11] To the extent Plaintiff bases her argument for disability discrimination on her allegations that "repeated comments" were made about her taking of sick leave during several meetings, (SAC. ¶ 41), the argument fails for several reasons. First, claims based on these comments, which allegedly occurred in 2014, are long since time-barred. Second, Plaintiff does not identify the speaker and in fact acknowledges that several persons not employed by BOCES (e.g., school principals) were present; accordingly, the Court cannot determine if the comments are attributable to BOCES. *See Fox*, 918 F.3d at 74 (explaining that hostile work environment claims require a finding that "a specific basis exists for imputing the objectionable conduct to the employer" (citation and quotation marks omitted)). Third, such comments (that Plaintiff was "always sick," that she "took a lot of time off," and that she "was always on medical leave," (SAC ¶ 41), especially when Plaintiff does not specify their extent or duration, are insufficient to sustain a "hostile work environment" theory. *See Lewis v. Erie Cty. Med. Ctr. Corp.*, 907 F. Supp. 2d 336, 349 (W.D.N.Y. 2012) (finding that statements questioning plaintiff's need for medical appointments did not constitute a hostile work environment); *Goldschmidt v. N. Y. State Affordable Hous. Corp.*, 380 F. Supp. 2d 303, 312 (S.D.N.Y. 2005) (rejecting a hostile work environment claim based, in part, on disparaging comments about scheduling accommodations made for a religiously observant Title VII plaintiff); *Kennebrew v. N. Y. C. Hous. Auth.*, No. 01-CV-1654, 2002 WL 265120, at *12 (S.D.N.Y. Feb. 26, 2002) (holding that disparaging comments about a pregnant plaintiff's frequent absences were insufficient to establish a hostile environment claim). Fourth, Plaintiff's own allegations indicate that her supervisors' and colleagues' animosity was *actually* based on her opposition to BOCES recordkeeping procedures. (*See* SAC ¶¶ 20–35 (describing being subjected to a disparate workload after objecting to certification and billing procedures).) In light of these allegations, comparatively minor comments about Plaintiff's taking of medical leave do not support a claim that disability discrimination was a "but-for" cause of her workplace challenges. *See Natofsky*, 921 F.3d at 349 (requiring "but-for" causation for ADA claims).

make clear that her allegations suggest that BOCES retaliated against her for her objections to

BOCES's accounting practices, not because of her disability.  (*See* SAC Ex. 1 ("NYDHR

Complaint") 10 ("As a result of her complaints concerning the failure to meet the clinical

standard, [Plaintiff] began receiving impossible workloads . . . .") (Dkt. No. 31-1).)  In sum,

Plaintiff's belated attempt to shoehorn old allegations of general workplace mistreatment into a

claim for disability discrimination is both implausible and unsuccessful.  Accordingly, any ADA

claims based on a hostile environment or constructive discharge theory is dismissed.

### d.  Retaliation

The ADA also prohibits employers from "discriminat[ing] against any individual because

such individual has opposed any act or practice made unlawful by this chapter or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  "Retaliation claims under the

ADA are analyzed using the same framework applied in Title VII cases."  *Thompson v. City of

New York*, No. 03-CV-4182, 2007 WL 4224370, at *4 (S.D.N.Y. Nov. 21, 2007) (citing *Lovejoy-

Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)), *adopted by* 2008 WL

294290 (S.D.N.Y. Feb. 1, 2008), *aff'd*, 348 F. App'x 643 (2d Cir. 2009).  To state a claim, a

plaintiff must similarly allege that: "[(1)] a plaintiff was engaged in protected activity; [(2)] the

alleged retaliator knew that [the] plaintiff was involved in protected activity; [(3)] an adverse

decision or course of action was taken against plaintiff; and [(4)] a causal connection exists

between the protected activity and the adverse action."  *Weixel v. Bd. of Educ. of City of New

York*, 287 F.3d 138, 148 (2d Cir. 2002) (citations and quotation marks omitted); *accord

McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018).  "A

plaintiff's burden at this prima facie stage is de minimis."  *Treglia v. Town of Manlius*, 313 F.3d

713, 719 (2d Cir. 2002) (citation and italics omitted).  Nonetheless, as with Title VII retaliation

claims, the ADA "does not permit mixed-motive causation for retaliation-based claims."

*Natofsky*, 921 F.3d at 348 (citation omitted); *see also Univ. of Texas Sw. Med. Ctr. v. Nassar*,

570 U.S. 338, 360 (2013) (explaining that Title VII retaliation claims, unlike standard Title VII

claims, require "but-for" causation).

Here, Plaintiff's retaliation claims fail for substantially similar reasons that her Title VII

and disability discrimination claims fail.  First, as noted above, all potential "adverse

employment actions" are time-barred because they occurred over 300 days before Plaintiff filed

a complaint with NYSDHR.  *See Jones*, 2020 WL 91532, at \*4 (explaining that ADA plaintiffs

claim must first file an administrative charge with the EEOC or an equivalent agency within

three hundred days after the alleged unlawful employment practice).  Second, even were the

Court consider time-barred conduct, Plaintiff has not alleged that any such actions were taken

*because* she was engaged in an ADA-protected activity.  *See Treglia v. Town of Manlius*, 313

F.3d 713, 719 (2d Cir. 2002) (requiring "a causal connection" between the adverse employment

action and her protected activity); *see also McGuire-Welch*, 720 F. App'x at 62 (same).  On the

contrary, although the SAC alleges "retaliation," it is clear that any such "retaliation" was a

response to her complaints about recordkeeping and workload.  (*See* SAC ¶¶ 20–35.)  The ADA

protects employees from retaliation for making complaints about disability discrimination; it

does not protect them from retaliation for complaints about other matters, no matter how

important.  *See Cornetta v. Town of Highlands*, — F. Supp. 3d —, 2020 WL 363042, at \*11

(S.D.N.Y. Jan. 22, 2020) (dismissing an ADA claim where the plaintiff was "only able to point

to complaints of . . . . alleged 'illegal acts,' corruption, and intimidation, and, critically, no

incident that could be construed as a complaint—formal or informal—of disability

discrimination" (record citation omitted)). Accordingly, Plaintiff's ADA retaliation claims are dismissed.

### III. Conclusion

For the reasons stated herein, Defendants' Motion To Dismiss is granted. Because this is the first adjudication on the merits of Plaintiff's claims, the dismissal is without prejudice. If Plaintiff wishes to file a third amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the third amended complaint will replace, not supplement, the SAC. The third amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, her claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion. (Dkt. No. 36.)

SO ORDERED.

DATED:     March /6, 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

36